## Holt v. Brookhaven Borough

*Edward J. Zetusky, Jr.,* for plaintiffs.

*Murray S. Eckell,* for defendants.

LIPPINCOTT, J., June 22, 1970.—

### A. STATEMENT OF ISSUES

This is a class action in equity by taxpayers of the Borough of Brookhaven seeking to have an ordinance increasing sewer rentals on certain properties declared illegal and to restrain its enforcement. Plaintiffs contend that the increase is unnecessary and that it will produce an illegal surplus. Defendants admit that a surplus will result, but argue that such surplus is legally permissible to create a capital reserve fund for anticipated future expansion of the sewer system. Defendants have also counterclaimed, seeking to impose upon plaintiffs all costs and expenses on the

ground that plaintiffs' suit is malicious and "politically motivated."

A hearing was held before the chancellor on May 15, 1970, sur an application for a preliminary injunction, at which time it was stipulated that a final determination of the case could be made upon the record adduced at such hearing.

## B. FINDINGS OF FACT

1. Plaintiffs are resident owners of properties in the Borough of Brookhaven, which are connected to the Borough's sewer system and subject to sewer rental charges.

2. Defendant, Borough of Brookhaven, is an incorporated municipality situate in Delaware County.

3. Defendant, S. Nelson Campbell, is the elected tax collector of the borough, charged with the responsibility of collecting the borough sewer rentals.

4. The borough is serviced by three separate sewage disposal or treatment systems: the Southwest Delaware County Sewer Authority, the borough's own plant, and that of the City of Chester.

5. 417 building units are treated by the Southwest Delaware County Sewer Authority, which units are not subject to the sewer rental charge of the borough and are not involved in this litigation.

6. 1,340 building units are treated by Chester, which receives this sewage either directly from Brookhaven or via the trunklines of two other municipalities.

7. 524 units are treated directly by the borough in its own disposal plant.

8. The 1,864 units treated by Chester and the borough are subject to sewer rental charges imposed by the borough.

9. For a number of years prior to and including 1969, the annual sewer rental charges in the borough were $25 per building unit and $12 per school unit.

10. In the latter part of 1969, the borough received notice that the City of Chester would increase its charge to the borough in 1970 for treating the 1,340 units by an additional $7 per unit.

11. On January 12, 1970, the borough adopted the ordinance in controversy, no. 291, which increased the annual sewer rental charges for all 1,864 units subject to sewer rentals from $25 to $32 for building units and from $12 to $16 for school units.

12. The only reason advanced by borough council for increasing the sewer rents was that the rate charged by Chester on the units treated by it was to be raised, there being no evidence that the operational costs of the disposal system would be any higher in 1970 than in 1969.

13. On November 30, 1969, immediately prior to the adoption of ordinance no. 291, the sewer fund of the borough had a cash surplus in the amount of $35,310.-99.

14. On December 22, 1969, the borough adopted its proposed budget for the calendar year 1970, which indicated that the surplus in the sewer fund at the end of 1970 was expected to be $42,184.99.

15. The anticipated expenditures as set forth in the proposed budget for 1970 included the $7 increase imposed by Chester for sewers serviced by that city.

16. The income then contemplated in the sewer rent budget was based on the 1969 sewer rentals of $25 per building unit and $12 per school unit.

17. The rentals proposed to be collected under ordinance no. 291 would further increase the cash surplus in the sewer fund by the end of 1970.

18. The sewer fund has no bonded indebtedness or debt service charges and the only annual expenses are the normal, yearly operational costs.

19. The sewage disposal system of the borough is

entirely adequate to service all units presently connected to it.

20. The Sanitary Water Board of the Commonwealth of Pennsylvania has never ordered the borough to enlarge or expand its existing sewage disposal system, nor has it indicated that said system is operating above capacity.

21. It is probable that future development in the borough will necessitate an expansion of the existing sewage treatment facilities by either tying into the Southwest Delaware County Sewer Authority or expanding the borough's own disposal system.

22. In anticipation of such future expansion, the borough had its engineer prepare plans for enlarging the borough's treatment plant.

23. While bids were received by the borough in September 1969 for such enlargement, no action has been taken by borough council toward accepting these bids.

24. It is unlikely that the borough at the present time could enter into contracts with any of said bidders because of the lapse of time since the bids were submitted.

25. The borough has also entered into negotiations with the Southwest Delaware County Sewer Authority in contemplation of future development in the borough and agreements have actually been drafted encompassing this alternative proposal.

26. Such contracts, if concluded, would negative the necessity for expansion of the disposal plant of the borough.

27. Plaintiffs and other present users of the sewage system would derive no benefit from future expansion of the borough's plant or by any contracts entered into with the Southwest Delaware County Sewer Authority.

28. The sole persons who would benefit from the expenditure of surplus funds for future expansion are owners of properties not yet tied into the sewage disposal system.

## DISCUSSION

The amounts of annual sewer rental charges are limited in boroughs by two statutory enactments:

1. The Borough Code of February 1, 1966, P.L. (1965) 1656, sec. 2062, 53 PS §47062, which provides:

"Such annual rental may include the amount expended annually by the borough in maintenance, repair, alteration, inspection, depreciation, or other expense, of such sewer, sewer system or sewage treatment works, and may include interest on money expended or borrowed by the borough in the construction of the sewer, sewer system or sewage treatment works, or in the acquisition, enlargement or extension of the sewer or sewer system, and may also include an amount sufficient for the amortization of debt incurred by the borough for any such purposes, including the construction of sewage treatment works according to law. The said annual or fixed sum shall be apportioned equitably among the several properties served by the said sewers, sewer system or sewage treatment works."

2. General municipal law Act of July 18, 1935, P.L. 1286, as amended, as set forth in 53 PS §2232:

"Any such annual rental, rate or charge may be, but shall not be limited to, such sum as may be sufficient to meet any or all of the following classes of expense: (a) the amount expended annually by the county of the second class, city, borough, incorporated town, or township in the operation, maintenance, repair, alteration, inspection, depreciation, or other expenses in relation to such sewer, sewerage system, or sewage treatment works; (b) such annual amount as may be

necessary to provide for the amortization of any indebtedness incurred, or non-debt revenue bonds issued, by the county of the second class, city, borough, incorporated town, or township in the construction or acquisition of such sewer, sewerage system, or sewage treatment works, and interest thereon, in order that said improvements may become self-liquidating, or as may be sufficient to pay the amount agreed to be paid annually under the terms of any contract or lease with any authority or private corporation furnishing, or undertaking to design or construct facilities with which to furnish, sewer, sewerage or sewage treatment services to such county of the second class, borough, town or township and its inhabitants; and (c) sufficient to establish a margin of safety of ten per centum. Any unused surplus from any preceding year shall be paid into the fund accruing from said rentals, rates or charges and, whenever the amount in said fund exceeds the said margin of safety of ten per centum, the excess shall be paid into the sinking fund. The amount required for sinking fund and interest shall be paid into the sinking fund, and the amount so paid, including any excess as above provided, shall not be used for any other purpose. The said annual rental or whatever rate or charge shall be decided upon by the county of the second class, city, borough, incorporated town, or township shall be apportioned equitably among the properties served by the said sewer, sewerage system, or sewage treatment works."

Other limitations on the amount of sewer rentals have been imposed by case law. Thus, it is clear under Pennsylvania law that the construction, operation and maintenance of a sewer system by a municipality is a proprietary function, and the municipality is only entitled to receive payment for such services as are actually rendered: Hamilton's Appeal, 340 Pa. 17, 16 A. 2d 32 (1940). The charge that is made for a sewer

service must be based upon actual user, and must be reasonably proportional to the value of the service rendered and not in excess of it: Gericke v. Philadelphia, 353 Pa. 60, 44 A. 2d 233 (1945).

The sewer rentals established by the contested ordinance in this case are in excess of the cost of the services rendered. The actual estimated cost of operation for 1970 as set forth in the proposed budget is $37,826, including $19,656 erroneously earmarked "Debt service." This latter amount includes the additional $7 paid to the City of Chester, since the budget was adopted well after the city advised the borough of its increased 1970 rate. Current revenue under the 1969 rate ($25 per building unit and $12 per school unit) is shown as $44,700, or an excess over expenses of $6,874, which is well over the 10 percent limitation allowed for a margin of safety by the statute. Furthermore, by increasing 1970 rates an additional $7 per unit and making this rate applicable to *all 1,864* units (instead of only the 1,340 served by Chester, for which the additional charge is made by that city) a substantial additional surplus will result. For these reasons, the chancellor finds that the charges proposed to be made are not reasonably proportional to the value of the service rendered.

Defendants do not dispute the fact that the rentals proposed are substantially in excess of operating costs or that a surplus will result. They attempt to justify the creation of such additional surplus (and, indeed, the existence of surpluses for prior years) on the ground that such surplus is needed for future capital expenditures and that the borough has a right to create a capital reserve fund[1] from present sewer rental charges either for expansion of the borough's

---

[1] Such a capital reserve fund is an afterthought in this case. No separate fund has ever been established, nor have surplus moneys been invested.

sewage disposal plant or by tying-in to the Southwest Delaware County Sewer Authority.

Recognizing that neither The Borough Code nor general municipal law pertaining to the amount of sewer rentals (53 PS §§47062 and 2232, supra) permits charges for creation of a capital reserve fund, defendants argue that another section of The Borough Code, 53 PS §46202(33), is applicable. This section provides that a borough shall have power "To create and maintain a separate capital reserve fund for anticipated legal capital expenditures. The money in the fund shall be used, from time to time, for the construction, purchase or replacement of or addition to municipal buildings, equipment, machinery, motor vehicles or other capital assets of the borough and for no other purpose.

"Council may appropriate moneys from the general borough funds to be paid into the capital reserve fund or place in the fund any moneys received from the sale, lease or other disposition of any borough property or from any other source, unless received or acquired for a particular purpose. The fund shall be controlled, invested, reinvested and administered and the moneys expended for any of the purposes for which the fund is created in such manner as may be determined by council. The money in the fund, when invested, shall be invested in securities designated by law as legal investments for sinking funds of municipalities.

"This clause shall not be construed to limit the powers of the borough to the use of moneys in the capital reserve fund in making lawful capital expenditures."

The capital reserve fund thus authorized must be created from (1) general borough funds, (2) moneys received from the disposition of borough assets, or (3) moneys "from any other source, unless received or acquired for a particular purpose." The first two

sources are obviously inapplicable under the facts in this case. As for the third category, moneys received from sewer rentals are received for a particular purpose under both the enabling acts, supra, and the appellate cases: Hamilton's Appeal and Gericke v. Philadelphia, both supra. The particular purpose is limited to the actual cost of operation plus debt service charges (and there are none here), i.e., for services based on actual use. There is, therefore, no authority in the statutes or cases permitting a current sewer rental charge to be made for the creation of a capital fund for future expansion.

Defendants have ignored a general municipal statute which *does* permit the accumulation of funds expressly for the creation of a sewage disposal system capital fund. It is provided in Act of April 8, 1949, P. L. 418, 53 PS §2292, that "Any municipality shall have power to create a special fund and to accumulate therein moneys for expenditure in accordance with provisions of this act. Such special fund may consist of, (1) moneys transferred during any fiscal year from appropriations made for any particular purpose, which may not be needed, (2) surplus moneys in the general fund of the treasury of the municipality at the end of any fiscal year, and (3) moneys appropriated to the fund in the annual budget. All moneys appropriated or transferred to this special fund shall be used only for the planning, construction, improvement or replacement of a sewage disposal system: Provided, That no moneys shall be used for any construction, improvement or replacement unless the plans therefor have been approved by the Sanitary Water Board."[2]

It thus appears from a review of this special act

---

[2] It is also provided that the moneys in the special fund shall be kept separate and apart from any other fund and invested. No such segregation of funds has been made in this case.

that a capital reserve fund for anticipatory future expansion of a sewage disposal system may only be created from general funds and appropriations, rather than from sewer rentals. The logical reason is that present users who pay rentals for use of the existing system will not benefit from such a capital fund. On the contrary, they would be charged for capital expenditures which would only benefit future users. The cost would thus not be "apportioned equitably among the properties served" as required by the statutes.

Defendants rely on Gericke v. Philadelphia, supra. In that case, it was held permissible for the City of Philadelphia to impose sewer rentals for future expansion. However, such case is distinguishable for several reasons. First, it was conceded that 97.3 percent of all properties in the City of Philadelphia were already connected to the sewage system, and thus present users *would* benefit from improvements. Secondly, the purpose of the fund was to correct inadequacies in the existing system, which also would benefit present users. In addition, it should be noted that the sewer rental charges were not to become effective until after money was borrowed or contracts entered into for construction, and that the rates increased as the new construction progressed. The Supreme Court further indicated that only actual users who would benefit should be charged rentals and stated, page 69:

"The present system, while urgently needing improvement, is available for use and in fact is in use by almost the entire city."

Our conclusion that sewer rental charges cannot be made for future capital improvements is buttressed by other statutory enactments covering boroughs. For example, 53 PS §47001 provides that boroughs, in constructing sewage treatment plants, ". . . may

pay the costs and expenses out of borough funds."

Also, 53 PS §46202(72) permits financing the expense of improving or enlarging sewer systems or sewage treatment works by the issuance of nonrevenue bonds, secured by rent from the use or services of such facilities, thus further indicating that future users should pay for future capital costs.

For these reasons, we rule that it is illegal to create a capital reserve fund or surplus for future expansion of a sewage disposal system, which will not benefit present actual users, by the imposition of sewer rentals in excess of the costs of operation. Since it is admitted that the 1969 sewer rates are entirely adequate to operate the system and that the only purpose of ordinance no. 291 is to continue or increase such illegal surplus, said ordinance must fall.

DECREE NISI

Now, June 22, 1970, it is ordered, adjudged and decreed that:

1. Ordinance No. 291 of the Borough of Brookhaven is declared illegal, void and of no effect.

2. The sewer rentals or charges for the calendar year 1970 in the Borough of Brookhaven shall remain at the same rate as existed during the calendar year 1969.

3. Defendants are hereby enjoined and restrained, jointly and severally, from enforcing the provisions of Ordinance No. 291 of the Borough of Brookhaven.

4. Defendants' counterclaim is dismissed.

5. The costs of this litigation shall be paid by the Borough of Brookhaven.

ORDER

The prothonotary is directed to enter this decree nisi and give notice thereof to the parties or their counsel of record. If no exceptions are filed within 20 days, the decree nisi shall be entered upon praecipe by the prothonotary as a final decree.