## Foley et al. v. West Middlesex
## Area School Dist.

*John R. DeAngelis*, for plaintiffs.
*P. Raymond Bartholomew*, for defendant.

ACKER, J., May 20, 1974.—This matter was initially presented as an application for a preliminary injunction. Subsequently it was agreed by counsel that the testimony received would be considered upon an application for permanent injunction. The latter was orally made in the course of the trial. Preliminary objections were filed to the complaint in equity. The court made disposition of some of the objections and reserved decision as to the balance. The court ruled from the bench that the petition raising a question of jurisdiction was without merit but reserved decision as to the petition raising the defense of lack of capacity to sue and the demurrer.

Testimony was taken from which this court concludes the following findings of fact.

### FINDINGS OF FACT

1. This action in equity was filed on May 7, 1974. On that date this court entered an order setting a

hearing for May 14, 1974, at 3:30 p.m. in Courtroom No. 2 to determine if a preliminary injunction should be granted.

2. A hearing was held on May 14, 1974, and continued the following day on May 15, 1974, until the testimony was concluded.

3. The named plaintiffs in this case are all individuals residing in the West Middlesex Area School District and are the parents of children presently in the school system.

4. Plaintiff, Richard Salatine, is in his 13th year as a teacher for the defendant-school district. He teaches industrial arts.

5. Mrs. Lavena J. Foley is in her 9th year as a teacher for the defendant-school district, teaching third grade.

6. Plaintiff, Martha A. Chupak, is in her 12th year of teaching with the defendant-school district and is a kindergarten teacher.

7. A school calendar was prepared in the spring of 1973 and was published dated August 1973 and distributed in September of 1973 after the strike giving rise to this action. It shows the last day of school as June 7, 1974.

8. That by that calendar 180 instructional days were provided and 183 days of contracted time for teachers' services for the school year of 1973-1974.

9. That school was scheduled to commence on September 5, 1973, but that at that time representatives of the teachers and the school board were still negotiating a proposed teachers' contract.

10. That the school board, as an inducement to the teachers not to withhold services, stated that any agreement reached would be made retroactive if the teachers elected to commence their services on the scheduled date of September 5, 1973.

11. That the teachers elected not to do so but instead to withhold their services during the course of the negotiations which culminated with an oral agreement on September 11, 1973. The remaining unresolved issue was whether school days would be scheduled for the lost five days of instruction.

12. On September 12, 1974, the teachers commenced their services and school instruction began.

13. That a formal contract was not signed between the parties until October 15, 1973, although the teachers continued rendering their services without a written contract from September 12th through October 15th. The teachers taught as scheduled the balance of the school year down to the time of the institution of this action and beyond.

14. That several meetings were held between the representatives of the teachers and the school board concerning an effort to resolve the five-day problem with the school board remaining consistent throughout that it would not reschedule the five lost days.

15. That through some effort—at least by the teachers—a letter was received by the school board in January of 1974 from Donald Carroll, the State Head of Elementary Education, advising the West Middlesex Area School District Board of the position of the Department of Education: that it desired the school district to make up the five days to give the full 180 days.

16. Advice was sought by the school board from two sources. First, its chief executive officer, Luther Low, Superintendent of Schools. He advised that in his opinion it was to the best interest of all that the five days be made up. His consideration was specifically directed to what would be most beneficial to the children. This advice was rendered in either January or February of 1974. Advice was also sought

from the solicitor of the school district as to whether the letter was mandatory. A response dated January 31, 1974, was received in early February which is in evidence, and was testified to by Superintendent Low and John Spangler, a member of the school board, left to the board's discretion whether to make up the five days lost.

17. Luther Low, the Superintendent, testified at the trial that he would not advise the school board at this late date to make up the five days because of the inconvenience to the families and the little that would be obtained from such instruction at this time.

18. The school board, upon receipt of the letter from Mr. Carroll on February 13, 1974, voted to not make up the lost five days. That vote was four to three with two abstentions.

19. A further vote was taken after the institution of the present action by the school board, again sustaining its position not to make up the lost five days.

20. The school board has not at any time informed the teachers, pupils, their parents or the general public that the five days would be made up, and it would appear all parties have traveled under the assumption that the school year would be 175 instructional days.

21. The complaint in equity bringing this matter into court was filed on May 7, 1974.

22. Henry Switzer, the President of the West Middlesex Teachers' Association, commenced efforts to have the Pennsylvania State Education Association assist in the commencement of an action as early as December 1973, but without success until the institution of the present action.

23. That the lost revenue through state subsidy by not having 180 days of instruction is approximately

$25,000. That the cost to the school district of having the teachers instruct each day is approximately $5,000 or a total cost for the five lost days of $25,000. That, therefore, there is no real loss to the school district of any substantial monies by the failure to make up the five lost days.

24. That the only explanation offered through the testimony for the failure to file the present action was the lack of interest by the state organization in furnishing counsel and legal advice until the institution of this action.

25. That, had the school board desired, there were days available in the existing school calendar that could have been used to make up the five lost days without the necessity of continuing school beyond the scheduled date of completion of the school year.

26. That the plaintiffs through their counsel, in the course of the hearing, conceded that it would not be necessary to extend the school year of the graduating class, but rather the primary concern of the plaintiffs was for those continuing in school in succeeding years.

Regardless of all other contentions advanced the plaintiffs are too late. In arriving at this almost self-evident truth, certain basic rules must be considered.

Although our legislature had declared that all public schools shall be kept open for 180 days of instruction for pupils (Act of March 10, 1949, P. L. 30, art. XV, sec. 1501, as amended, 24 PS §15-1501) the courts are wisely vested with the power and duty to determine whether the board's action is "based solely on consideration for the people's interest and a thorough and efficient system of education . . . to . . . conform to the public interest."[1]

[1] Root v. Northern Cambria School District, 10 Comm. Ct. 174, 179, 309 A. 2d 175 (1973).

Much of plaintiffs' testimony was directed to proving that the board acted contrary to the best interest of the students by failing to provide "make up days" months before the date of this hearing. Further, both sides attempted to convince the court that the other had a disregard for the welfare of the students. Finally, the court informed both counsel that such matters may have "historical value" and be a great concern to the parties but have no real meaning in resolving the present issue. What has to be looked at is what public interest is served by forcing all the pupils into an additional week of instruction by an order proposed to be entered in the middle of May. Was there an arbitrary or capricious exercise of judgment[2] by the school district at this late date?

This board by its solicitor on February 13, 1974, was advised it could exercise its discretion in making up the lost five days. Whether it acted wisely or even arbitrarily at that time is of no present moment.

Although two of the plaintiffs-teachers testified they could not complete all their course of instruction in 175 days they also felt 180 days was insufficient.

Our appellate courts have held school boards are not required to do the "impractical or the impossible"

---

[2] Zebra v. Pittsburgh School District, 449 Pa. 432, 296 A. 2d 748 (1972), at page 437, clearly puts the power of the courts in perspective in reviewing decisions by school boards. "Courts are further restrained, when dealing with matters of school policy, by the long-established and salutary rule that the courts should not function as super school boards. We will not interfere with the discretionary exercise of the school board's power unless the action was based upon 'a misconception of law, ignorance through lack of inquiry into the facts necessary to form an intelligent judgment, or the result of arbitrary will or caprice' . . . 'It is only when the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity.' The burden of showing such an abuse is a heavy one and rests with the parties seeking the injunction."

in circumstances not within their control.[3] A strike is one of the most obvious such situations.

It is inconceivable to this court that the teachers, knowing of the reduced school year, would not by the middle of May have revised their own programs of teaching to compensate for the five lost days.

Finally, what of the interests of the students?[4] Summer vacations, jobs, trips are all subject to disruption. Certainly the students and their families have some right to know earlier than the middle of May when school will end.[5]

None of us should be so far removed from our youth as to forget the last week of each school year. What is accomplished? The testimony disclosed, as to the final several days, classes consist of turning in books, an occasional picnic and appearing for report cards. To say an additional five days will benefit the students is to forget one's youth and ignore reality.

The conclusion of this court does not ignore the most substantial legal questions contended. This

[3] Root v. Northern Cambria School District, supra.

[4] Bellefonte Area School Board v. Bellefonte Area Education Association, 9 Comm. Ct. 210, 304 A. 2d 922 (1973), through Judge Kramer concurring at page 220 recognizes the need of concern for students stating: "They are pawns in an adult game of economics."

[5] This court has received a petition containing 124 names of parents who do not desire the court to order a make up of five calendar days. In addition, this court has received numerous letters from individual parents, not one of which has expressed any desire to have school continue beyond the scheduled termination date. Finally, the plaintiffs and their witnesses admitted on cross-examination that the teachers were unable to secure parents to act as plaintiffs who were not themselves teachers in the school system. From this the court concludes that the position of the vast majority, if not all of the non-teaching parents, is that they do not desire school to be open an additional five days for make up.

court is concerned at the standing of three teachers-parents to impose the consequences of this law suit upon hundreds of students and parents involved.[6]

We are also concerned that as a matter of law, through the equitable doctrine of laches, the teachers may have delayed too long to have their case considered on its merits.[7]

We choose, however, to decide this case by applying plain common sense to the facts. It is simply now too late to order school to continue five additional days. No real benefit would be derived for those to whom we must be concerned, i.e., the students. The school board correctly exercised its discretion as of its May decision.[8] We will not order school to continue as requested.

[6] Although this action is not termed a class action, it would appear that it might more appropriately be brought under Pa.R.C.P. 2230. Gericke v. Philadelphia, 353 Pa. 60, 44 A. 2d 233 (1945); Penn Galvanizing Co. v. Philadelphia, 388 Pa. 370, 130 A. 2d 511 (1957). Further, a person seeking relief on behalf of himself and others who would stand in the same relation with him must demonstrate that the relief sought is of a nature beneficial to all those the plaintiff undertakes to represent: Penn Galvanizing Co. v. Philadelphia, supra.

[7] The doctrine of laches is applicable where, under the facts of a particular case, the complaining party is guilty of lack of due diligence in failing to institute his action but to another's prejudice: Siegel v. Engstrom, 427 Pa. 381, 235 A. 2d 365 (1967); Wilson v. King of Prussia Enterprises, Inc., 422 Pa. 128, 221 A. 2d 123 (1966).

[8] It is apparent that the plaintiffs, who were requested to file this action by a representative of the teachers organization, were carefully selected. They are all parents of children in the school system, had not participated in the negotiating sessions and were not officers of the union. This court was, however, clearly of the impression that all of the plaintiffs were conscientious teachers who felt strongly that their position was correct because of their interest in the school system and the children.

This case, however, does have strong overtones of efforts to establish precedents for future bargaining sessions. This opinion has been written expressly to attempt to avoid any such prece-

## CONCLUSIONS OF LAW

1. The School Directors of the West Middlesex Area School District did not abuse their discretion, arbitrarily or capriciously, in deciding in May of 1974 to refuse to continue the school year for an additional five days.

2. Under the circumstances of this case, the School Directors of the West Middlesex Area School District are not required to provide a full 180 days of instruction to their students.

## DECREE NISI

And now, this 20th day of May, 1974, it is hereby ordered and decreed that the prayer of the complaint for a preliminary final injunction to require the School Directors of the West Middlesex Area School District to conduct an additional five days of instruction to provide a total of 180 days of instruction before June 30, 1974, is denied.

The preliminary objection of the defendant-school district is denied.

Notice of this decree and decision shall be given to the parties involved through their attorneys by the prothonotary of this court pursuant to Pa. R.C.P. 1518. Any aggrieved party may, within twenty days of notice of the filing of the adjudication, file exceptions to the rulings on objections to evidence, to findings of fact, to conclusions of law and to the decree nisi. Each exception shall set forth a separate objection precisely and without discussion. Matters not covered by exceptions are deemed waived unless prior to the final decree leave is granted to file exceptions raising these matters.

---

dents. No opinion is expressed as to the merits of the original strike, whether the school board acted properly at any time prior to its May decision or what might happen next year if a similar strike occurred.

If no exceptions are filed within a twenty day period the decree nisi shall be entered by the Prothonotary on praecipe as a final decree.