## Parker, Appellant, v. Philadelphia.

Argued November 20, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Jones and Cohen, JJ.

*Joseph S. Lord, III,* with him *Barbara Ann Duffy,* for appellants.

*James L. Stern,* Deputy City Solicitor, with him *James L. J. Pie,* Assistant City Solicitor, and *David Berger,* City Solicitor, for appellees.

Opinion by Mr. Justice Chidsey, January 8, 1958:
This is an appeal from the refusal of the court be-low to grant a preliminary injunction which would

have restrained the City and several of its officers from proceeding with the selection and appropriation of an incinerator site at Umbria Street and Domino Lane in Philadelphia pursuant to an ordinance approved March 7, 1957.

On March 13, 1953, a rezoning ordinance was approved by the City of Philadelphia, after hearings, to permit the construction of an incinerator to service the northwest quadrant of Philadelphia on City-owned land near Fox Street and Abbotsford Avenue, located in the south central portion of that northwest quadrant. An adjacent property owner brought an action in equity to restrain erection of the incinerator. Testimony was taken in the court below, and the injunction was granted. On appeal to this Court, the order was modified and affirmed enjoining the City from enforcing the ordinance of March 13, 1953 because it was enacted in disregard of certain procedural requirements then in effect, Kelly v. Philadelphia, 382 Pa. 459, 115 A. 2d 238.

On March 7, 1957 the Mayor of Philadelphia approved an ordinance entitled "An Ordinance to select and appropriate a certain tract of land situate on the northeast side of Umbria Street at Domino Lane for incinerator purposes; and repealing inconsistent legislation". This Domino Lane site, similarly intended to service the northwest quadrant of Philadelphia, was located near the northwest corner of that quadrant, some five miles from the earlier Fox Street and Abbotsford Avenue location.

This complaint in equity in the nature of a taxpayer's bill was filed on May 24, 1957 by two taxpayers, one of whom owns property about a half mile from the proposed Domino Lane site, and the other who owns property at a somewhat greater distance. The gravamen of the complaint is that the erection of the Dom-

ino Lane incinerator would "constitute an unnecessary diversion, wasting and misappropriation of the funds of the City of Philadelphia", particularly in view of the alleged lesser cost of erecting and operating the Fox Street site as previously contemplated. The basic allegations supporting this contention as set forth in the complaint are: (1) that the Domino Lane site would cost in excess of $300,000 more per year to construct, maintain and operate than an equivalent incinerator at the Fox Street location; (2) that the City would be compelled to expend substantial sums to purchase the Domino Lane site, whereas it already owns the Fox Street site; (3) that by acquiring private land in the Domino Lane area a loss of tax revenue now received from that land would occur to the detriment of the City; (4) that in order to utilize the Domino Lane site the City would be compelled "to widen, relocate and improve the streets in the vicinity" in order to provide adequate access to it; and (5) that funds would have to be expended by the City for contracts, drawings, etc., in connection with the proposed construction of the incinerator.[1]

The City's answer alleged that the Fox Street land had been purchased by the City for the purpose of improving its water supply system and is not now available for the construction of an incinerator; and (1) it denied that the construction, operation and maintenance costs of the Domino Lane site would be greater than at Fox Street; (2) that the Domino Lane land is inexpensive, being an unimproved, desolate area currently used as a burning dump, and that its value and

---

[1] It was also contended below by the appellants that an injunction should issue because the incinerator would constitute a nuisance. The court below dismissed this point summarily on the authority of *Kelly v. Philadelphia*, supra, and it is not pressed on this appeal.

that of sub-level land in the area would be increased by the use of the incineration product as a filler on the land; (3) that the loss of tax revenue to the City would be only $528 per annum; (4) that although the streets in the vicinity will be widened, relocated and improved, the street improvement in the area is long overdue and would take place regardless of the incinerator construction, and (5) that the cost of contracts, drawings, etc., are not a loss, but rather the necessary expense of a needed improvement.

A hearing was held on plaintiff's rule for a preliminary injunction before the President Judge of Common Pleas Court No. 5 of Philadelphia on July 1, 1957. John S. Byrne, the owner of a tract of land amounting to slightly over twenty-nine acres, of which some twenty-three are to be condemned by the City for the proposed Domino Lane incinerator, testified that he purchased the entire tract early in 1956 for $25,000, and that the real estate taxes for the entire tract are "around $600". The plaintiff Parker testified that several of the roads in the area were not paved, that there is a house in the vicinity of 2,000 feet from the proposed incinerator, and that there are two other homes, which are in bad condition, closer to the proposed site, ". . . whether they are occupied at this time I don't know, but they were the last time I went by there." Plaintiffs further offered to call an appraiser in whose opinion the twenty-three acres to be condemned were said to be worth $60,000.

The bulk of plaintiff's case, however, consisted of excerpts from the testimony of the City's witnesses taken at the hearing below in *Kelly v. Philadelphia;* supra, some three and a half years earlier. The tenor of these excerpts was that, because of the location of the Domino Lane site on the more sparsely populated fringe of the city, the cost of collecting and transport-

ing the rubbish would be much greater if the incinerator were located there, than if it were located at the Fox Street site, which is much closer to the heavily populated North Broad Street section. The City had considerable misgivings as to the probative value of this evidence—the statistical basis being several years old and the contemplated collection areas in the two cases being somewhat dissimilar—but the court below assumed arguendo that operation of the Domino Lane site would be somewhat more expensive than the Fox Street site, and this assumption may also be made for purposes of this appeal. The chancellor determined that the only evidence of waste in the record was this disparity in operating costs, and decided that this factor alone was insufficient to permit the grant of a preliminary injunction against a presumptively valid city ordinance. From the discharge of plaintiffs' rule for a preliminary injunction this appeal is prosecuted.

Plaintiffs have chosen to take this appeal from the refusal of the preliminary injunction and to incur the additional burden thereby placed upon them rather than waiting for a final determination on the merits. As we stated in *Lindenfelser v. Lindenfelser*, 385 Pa. 342 at p. 343, 123 A. 2d 626:

"Our uniform rule is that, on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: Commonwealth v. Katz, 281 Pa. 287, 288, 126 A. 765; Lesher v. Thomas S. Cassner Co., 285 Pa. 43, 44, 131 A. 657; Murray v. Hill,

359 Pa. 540, 541, 59 A. 2d 877; Cohen et al. v. A. M. Byers Company et al., 363 Pa. 618, 619, 70 A. 2d 837." We believe that, not only did the chancellor have reasonable grounds for discharging plaintiffs' rule for a preliminary injunction, but that this action was eminently correct under the facts as presented.

Plaintiffs' basic contention, and indeed the only one on which they adduced any substantial evidence, was that it would be more expensive to operate the Domino Lane incinerator than it would be to operate one at the Fox Street location. Standing alone, a mere showing of a higher prospective operating cost of one incinerator site as compared to another, in the absence of fraud or similar impropriety, provokes the conclusion that there were other presumably valid reasons for the selection of the approved site by the responsible City officials and the enactment of the necessary legislation by the City Council. Prospective land utilization, contemplated neighborhood developments, anticipated population shifts, estimated traffic congestion, the effect of incinerator construction on the existing neighbors—all these—are pertinent considerations for the City Council, and indeed it would probably be remiss if those factors were not considered by it in the enactment of the ordinance. It is, of course, to be presumed that municipal officers have properly acted for the public good, *Campbell et al. v. Bellevue Borough School District,* 328 Pa. 197, 195 A. 53; *Gericke et al. v. Philadelphia et al.,* 353 Pa. 60, 44 A. 2d 233; *Downing v. Erie City School District et al.,* 360 Pa. 29, 61 A. 2d 133. There is no allegation, nor even an implication, in this case that the City officials acted from some improper or fraudulent motive. This case is wholly unlike the waste and misappropriation cases cited by appellants in their brief. There is no conspiracy "to defraud the city into paying an excessive

price for the property" as was alleged in *White et al. v. Chester Municipal Authority et al.*, 349 Pa. 118, 36 A. 2d 455; nor are the municipal authorities alleged to be paying for something which is asserted to be beyond the power of the sellers to sell (extended insurance coverage) as in *Downing v. Erie City School District et al.*, supra; nor is it alleged that the items to be purchased from a specific municipal fund (bond issues in these instances) are outside of the authorized purposes for which the fund was gathered, as in *Wilds et al. v. McKeesport City School District*, 336 Pa. 275, 9 A. 2d 388, and in *Wolff Chemical Company v. Philadelphia*, 217 Pa. 215, 66 A. 344. In the instant case there is no question but that the City is authorized to build necessary incinerators, and purchase land and materials therefor from the proper owners, nor is there the slightest implication that fraud or other unlawful gain or conspiracy has motivated the City Council's action. It is not sufficient that appellants disagree with the *wisdom* of the City Council's action. A court of equity will not substitute its determination of what may be wise for the decision of the appropriate governmental body, absent a showing of bad faith, abuse of power, etc. See *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 109 A. 2d 331, and the numerous cases cited therein at p. 572. The *Blumenschein* case, supra, is particularly apposite here, because in that action to enjoin the Housing Authority from taking certain properties for a public housing project it was alleged, among other things, that the selection of one site was "arbitrary and constituted an abuse of discretion on the part of the Authority" because another site would be more appropriate for several reasons, among them that the other site would involve a lower cost. Chief Justice HORACE STERN's language at pp. 572, 573, is especially appropriate here:

". . . Indeed, whatever may be said of the merits or demerits of the site selected by the Housing Authority, plaintiffs wholly misconceive the extent of the judicial power to review the exercise of the Authority's discretion confided to it by the Legislature of the Commonwealth. The selection of a site for a large housing project necessarily involves many considerations; it is largely a question of practical judgment, common sense and sound discretion. By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion. . . ."

What was stated in the *Blumenschein* case, supra, as to administrative agencies applies a fortiori to the actions of an elective legislative body. See particularly *Wentz v. Philadelphia et al.,* 301 Pa. 261, 151 A. 883.

Plaintiffs contend that the evidence introduced sufficiently supports their other allegations. Assuming arguendo that it was established that the City would have to pay something for the Domino Lane property, would lose some tax revenue, would have to construct

and improve some streets, and would have to incur engineering and contracting expenses, still it is clear that none of these allegations constitutes "waste" such as to warrant the issuance of a preliminary injunction.

The allegation that it constitutes waste for the City to purchase land at one place while it owns some land five miles away is wholly without merit. There is no evidence of the respective worth of the Fox Street acreage as against the Domino Lane acreage. It is quite conceivable that, because of its more central location, a sale of the City-owned land at Fox Street and Abbotsford Avenue would bring a price per acre far in excess of the purchase price of the Domino Lane land. Furthermore, it is quite possible that its retention by the City for other civic purposes would result in a substantial long-run saving to the City. A publicly owned housing development and a reservoir and water treatment plant stand very near to the Fox Street site. It is idle for us to speculate as to the use City Council contemplates for that tract, but certainly an expansion of the water or housing use, or the erection of a playground or other facility on that land would be a determination for Council to make and one with which this Court will not interfere.

In *Wentz v. Philadelphia,* supra, a similar contention was raised that it is waste for the City to purchase land when it already owns land which might be applied to the contemplated civic project. In that case it was sought to enjoin the carrying out of an agreement authorized by a Philadelphia ordinance looking to the construction of an airport. To a contention that the City already had land for airport and allied purposes, Mr. Justice SADLER answered, p. 275: "The amendment to the bill, filed since the argument, requires but a brief notice. By it, plaintiff avers that an adjoining property containing some 239 acres, and forming part

of a larger tract 'having a frontage of approximately 3,500 feet on the Schuylkill River,' is now owned, maintained and operated by the city as a municipal airport, and these facts, in plaintiff's opinion, 'renders wholly unnecessary the acquisition of the 610 acres to be held, used and occupied by the City of Philadelphia as and for a railroad and marine terminal, as provided in said ordinance and contract.' Under the circumstances here appearing, it is not for plaintiff, nor indeed for the court, but for the city herself, to determine what quantity and location of land shall be used for the purposes expressly authorized by the Act of 1925. If fraud, bad faith, or what amounts to one or the other, was averred, a different question would arise, but none such is suggested by the record."

The allegation that it constitutes waste for the City to condemn private land because of the reduction in tax revenues would have doubtful merit even if the proposed condemnation were in a highly assessed area. Where the tax revenue to be lost per annum amounts to but approximately $20 per acre, the argument possesses no merit.

As to the contention that a wasteful construction of streets would be necessitated by the erection of an incinerator at the Domino Lane site, the evidence produced by plaintiffs established only that the streets in the vicinity of the proposed site are not in good condition and are largely unpaved. While it may be conceded that should an incinerator be constructed in the area, some street improvement would be necessary, this is far from proving that such construction of streets would be "an unnecessary diversion, wasting and misappropriation of the funds of the City". Indeed plaintiffs' evidence indicates that street improvements are needed in the Domino Lane area, regardless of the proposed incinerator construction. This is borne out by

the City's answer which alleges that this street construction would be undertaken regardless of the incinerator site "to remedy a presently inadequate system of streets and highways in the area. This program is long overdue and is necessary to the residential and industrial growth of the area." At any rate, such street construction is merely ancillary to the proposed incinerator construction. Certainly if the City may properly locate an incinerator in the Domino Lane area, it not only may, but properly should provide the needed access to the site. A portion of the expense of such construction might well be considered in connection with the total cost of the incinerator, but absent an evidentiary showing of the cost of such street construction and the proportion of that cost which should properly be allocated to the incinerator, and absent a showing that the construction of streets in the area is in some way improper, a court cannot be called upon to declare that a civic project should be enjoined simply because the streets in the area may have to be improved or extended as a result of the proposed project. Furthermore, it is again a complete answer to this contention that in the absence of a showing of fraud, bad faith, etc., the determination of the proper location for streets and the necessity of improvements thereto are decisions well within the City Council's discretion.

Similarly without merit is the contention that it would be a waste to expend City funds for drawings, contracts, etc., in connection with the new construction. It must be obvious that these expenses would be incurred wherever an incinerator were located, and it cannot be seriously contended that such expenses, when necessary to valid civic projects, are improper.

The order discharging plaintiffs' rule for a preliminary injunction is affirmed.