938 A.2d 341

Appeal of **REDEVELOPMENT AUTHORITY OF the CITY OF PHILADELPHIA for the Purpose of Redevelopment of North Philadelphia Redevelopment Area Model Cities Urban Renewal Area Condemnation No. 30 B Philadelphia, PA including certain Land Improvements and Properties**

**Re: 1839 North Eighth Street.**

Supreme Court of Pennsylvania.

Argued April 16, 2007.

Decided Dec. 27, 2007.

242

David J. Perlman, David Paul Heim, George Bochetto, Bochetto & Lentz, Philadelphia, for Redevelopment Authority of City of Philadelphia, appellant.

Lewis Rosman, City of Philadelphia Law Dept., for City of Philadelphia, appellant amicus curiae.

Edward M. Posner, Drinker, Biddle & Reath, L.L.P., Philadelphia, for The Hope Partnership, appellant amicus curiae.

Robert J. Sugarman, Sugarman & Associates, P.C., Philadelphia, for Mary Smith, appellee.

Steven Freeman, New York City, for Anti–Defamation League, appellee amicus curiae.

Barry E. Ungar, Theodore R. Mann, Judah Isiah Labovitz, for Jewish Social Policy Action Network, et al., appellee amici curiae.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice BALDWIN.

The primary question raised in this appeal is whether taking private property, certified as blighted 36 years previously, by eminent domain, in order to convey the property to a religious entity as part of a redevelopment plan, violates the Establishment Clause of the United States Constitution. The Commonwealth Court, in a four-three *en banc* decision, reversed the Court of Common Pleas of Philadelphia's determination that the taking was lawful, and found that, among other things, the taking violated the Establishment Clause. Because we believe that under the limited facts of this case the taking was Constitutional, we reverse.

In 1968, the neighborhood surrounding 1839 North Eighth Street in Philadelphia (the "Property") was certified as blighted by the City of Philadelphia's Planning Commission (the "Planning Commission"). Veronica Smith Howard and her mother, property owner Mary Smith ("Condemnee") resided in the house on the Property at that time.

On September 4, 2002, the Hope Partnership for Education (the "Hope Partnership"), a coalition of several Catholic groups, sent a letter to Philadelphia's Redevelopment Authority (the "RDA") requesting that the RDA acquire 39 specific parcels that the Hope Partnership had targeted in eastern North Philadelphia (including the Property) for the purpose of building a non-denominational, faith-based, not tuition based school for children of the blighted neighborhood and its surroundings. The RDA prepared a redevelopment proposal for the Planning Commission, including the request from Hope Partnership. The Planning Commission approved the proposal, which was then submitted to Philadelphia's City Council ("City Council"). Following a public hearing, the City Council passed an ordinance approving the acquisition of, among other things, the 39 properties designated by the Hope Partnership and the Partnership was identified as the developer. There is no question that these properties were blighted—only two were actually still occupied—and the estimated just compensation for the Property was $12,000. All 39 properties were to be transferred to the Hope Partnership. R. 69a.

The Thirtieth Amended Redevelopment Proposal ("Redevelopment Proposal") covered significantly more than just the acquisition for the Hope Partnership. One thousand three hundred seventy six parcels were acquired for eighteen separate projects, with purposes including: (1) building affordable housing units for first-time homebuyers; (2) renovating historic structures for affordable housing for the elderly; (3) building low-income senior rental housing; (4) creating community gardens and related programs; (5) building a religiously operated middle school (the Hope Partnership program); (6) building low-income rental housing; (7) expanding existing business use; (8) building rental units for persons or families living

with HIV or AIDS; and (9) future development. R. 88b–91b. Of the eighteen projects, only four had their acquisition costs paid for outside of the Redevelopment Authority's funding for renovation of the area: (1) the Women's Christian Revitalization Program low-income rental housing development (acquisition costs paid for by the Office of Housing and Community Development ("OHCD")); (2) an expansion of an existing business, Komplete Welding (acquisition costs paid for by the Philadelphia Authority for Industrial Development); (3) Advocate Community Development Corporation's development of rental units for persons or families living with HIV or AIDS (acquisition costs paid for by OHCD); and (4) Project H.O.M.E.'s development of housing for low-to-moderate income first-time homebuyers (acquisition costs paid for by Project H.O.M.E.). Of the entities designated as developers, some were religiously affiliated and others were not.

Condemnee filed preliminary objections to the taking on December 23, 2003. Condemnee alleged, among other things: that the taking of the Property was not for a public purpose; that the taking was arbitrary, capricious and discriminatory; that the taking is the result of a predetermined illegal commitment to a religiously-affiliated private entity; and that Condemnee's due process rights were violated.

The trial court overruled the preliminary objections, finding that "[o]nce the land was certified as blighted, it is proper then to transfer the land to private development, regardless of 'who' that future developer may be." *In Re: 1839 N. Eighth St.*, November Term, 2003, No. 2988, slip op. at 3 (Pa. Ct. of Com. Pleas of Philadelphia Cty. February 24, 2004). The trial court relied upon this Court's decision in *Belovsky v. Redevelopment Auth.*, 357 Pa. 329, 54 A.2d 277 (1947), in which we stated that the taking of private land deemed blighted was proper because the statute's purpose was "the clearance, reconstruction and rehabilitation of the blighted area" and the separate, subsequent transfer to a private developer was "purely incidental to the accomplishment of the real or fundamental purpose." *Id.* at 340, 54 A.2d at 283. Because the trial court found the taking of the property due to its blighted

condition was legitimate, it refused to entertain any argument regarding whether the subsequent transfer of the property to a developer that is a religious entity violated the Establishment Clause of the First Amendment of the United States Constitution[1] or Article I, Section 3 of the Pennsylvania Constitution.[2] The trial court noted that there was no contention that the property was not blighted, the taking of the Property for the purpose of eliminating blight was a legitimate purpose, and that Condemnee had failed to challenge the certification of blight when it was made.

The Commonwealth Court reversed, finding four errors in the trial court's decision. According to the Commonwealth Court, the trial court erred: (1) in holding that land certified as blighted may be acquired and transferred to a private developer without regard to the identity of the developer; (2) in presuming that a condemnee's failure to challenge the certification of blight constituted waiver of any challenge to the taking; (3) in rejecting a condemnee's claim that the taking implicated an impermissible entanglement of church and state; and (4) in finding that a determination of blight was sufficient reason to justify the exercise of eminent domain.

Judge Pellegrini authored a dissent, joined by Judges Leadbetter and Leavitt, in which he found that in order for the taking to be invalid, Condemnee was required to prove that her property was not located in a blighted area, which she failed to do. According to Judge Pellegrini, the fact that the potential developer was a religious entity was not pertinent to the decision. Relying on *Belovsky*, the dissent would have found that the public purpose necessary to effectuate the taking is completely realized when the taking occurs for the purpose of clearance, reconstruction and rehabilitation of the blighted area. *In re 1839 N. Eighth St.*, 891 A.2d 820, 834

---

1. "Congress shall make no law respecting an establishment of religion. . . ." U.S. Const. amend. I. The Establishment Clause was incorporated to the states in *Everson v. Bd. of Ed.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

2. "[N]o man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry without his consent. . . ." Pa. Const. art. I, § 3.

(Pa.Commw.Ct.2006) (Pellegrini, J. dissenting) (*citing Belovsky* at 340, 54 A.2d at 282–83). Because elimination of blight is a valid purpose, any challenge to the taking based on the Establishment Clause will not prevail. The dissent additionally stated that even if they were to address the Establishment Clause issues, Condemnee would not prevail. Indeed, according to the dissent, to permit them to prevail would constitute "viewpoint discrimination" against religious groups, which is an impingement on the religious group's First Amendment Rights. *In re 1839 N. Eighth St.,* 891 A.2d at 834 (Pellegrini, J. dissenting) (*citing Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)).

The RDA petitioned this Court for a grant of allocatur, which was granted.

 An appellate court's scope of review where a trial court has sustained or overruled preliminary objections to a declaration of taking is limited to a determination of whether the trial court abused its discretion or committed an error of law. *Condemnation of 110 Washington St.,* 767 A.2d 1154, 1157 (Pa.Commw.Ct.2001). Review of the RDA's certification of blight and subsequent taking is limited to a determination that the RDA has not acted in bad faith, has followed the statutory procedures, and has not violated any constitutional safeguards. *Crawford v. Redevelopment Auth. of Fayette County,* 418 Pa. 549, 553, 211 A.2d 866, 867 (1965).

 The record does not support a bad faith claim against the RDA. "Public officials are presumed to have acted lawfully and in good faith until facts showing the contrary are averred, or in a proper case are averred and proved." *Robinson v. Philadelphia,* 400 Pa. 80, 86–87, 161 A.2d 1, 5 (1960) (*citing Parker v. Philadelphia,* 391 Pa. 242, 249–50, 137 A.2d 343 (1958); *Hughes v. Chaplin,* 389 Pa. 93, 132 A.2d 200 (1957)). Justice Kennedy, in *Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), instructed that "[a] court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has

merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose." *Kelo* at 491, 125 S.Ct. at 2669, 162 L.Ed.2d at 459 (Kennedy, J. concurring). Additionally, in the instant case, the statutory procedures were followed, i.e., there was a plan, a public hearing, and approval by City Council. 35 P.S. §§ 1709 & 1712. Therefore, what remains is a review of whether the taking of the Property effectuated a constitutional violation, i.e., it violated the Establishment Clause.[3]

■ The constitutional violation allegation centers on whether the Commonwealth Court's review of the Establishment Clause issue was too narrow, leading to a misapplication of the three-part test announced in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). This Court has noted that *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), has not limited or abrogated the *Lemon* test. *Haller v. Dep't of Revenue*, 556 Pa. 289, 292, 728 A.2d 351, 352 (1999). The *Lemon* test requires, for a government action to survive an Establishment Clause challenge, that the state demonstrate: (1) that the action serves a secular purpose; (2) that its principal or primary effect neither advances nor inhibits religion; and (3) that it does not foster an excessive government entanglement with religion. *Lemon* at 612–13, 91 S.Ct. at 2112, 29 L.Ed.2d at 756. The majority opinion in the Commonwealth Court found that the taking in this instance violated all three prongs of this test. First of all, the Hope Partnership requested specific land, which was acquired by eminent domain. This did not serve a secular purpose, but rather a purely religious one. Second, the principal or primary effect advanced religion by creating a religious school where there had not been one. Last, the relationship between the Hope Partnership and the RDA demonstrates excessive entanglement. *In re 1839 N. Eighth St.*, 891 A.2d at 830.

3. Although it was addressed below, Appellee does not raise the Pennsylvania Constitution in this appeal. This Court will not address such issues sua sponte. *Commonwealth v. Karash*, 513 Pa. 6, 8, 518 A.2d 537 (1986) (citing *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975)).

■ As to the first prong of the *Lemon* test, the Commonwealth Court is clearly in error. The secular purpose in the RDA's taking of the Property was but another in a series of steps taken to eliminate blight, as established in the Urban Redevelopment Act. 35 P.S. § 1702 ("Redevelopment Authorities ... shall exist and operate for the public purposes of the elimination of blighted areas through economically and socially sound redevelopment of such areas ... in conformity with the comprehensive general plan of their respective municipalities"). The Property was one of many properties in the area, all certified as blighted for over a third of a century, which were acquired after a developer was found who expressed an interest in the redevelopment project. The Property was acquired pursuant to the Redevelopment Plan. R. 42b–63b. The elimination of blight is a valid public purpose that, in the absence of bad faith, is completely separate from any religious use of the property subsequent to the taking. *See In re Condemnation by the Urban Redevelopment Auth. of Pittsburgh*, 590 Pa. 431, 913 A.2d 178 (2006); *Belovsky v. Redevelopment Auth., supra.* Indeed, in *Belovsky,* this Court found that "far from it being legally objectionable that property acquired by eminent domain be resold or retransferred to private individuals after the purpose of the taking is accomplished, the law actually requires" that it be so transferred. *Belovsky* at 341, 54 A.2d at 283. In *Kelo,* the United States Supreme Court approved a taking which was purely for economic development, and not of property previously determined to be blighted, finding that the necessary public purpose had been established. *Kelo* at 484–85, 125 S.Ct. at 2665–66, 162 L.Ed.2d at 454–55.

The second prong of the *Lemon* test has to do with whether the principal or primary effect of the government action, in this case, the taking of the Property, is to advance or inhibit religion. The Commonwealth Court found that the acquisition "had a primary religious effect because it directly aided the religious organization's mission to provide faith-based educational services, among other things, to residents in the blighted area." *In re 1839 N. Eighth Street* at 830. We reject

the Commonwealth Court's analysis, and find, for the following reasons, that current Establishment Clause jurisprudence would permit the taking of the Property for the purpose of conveying it to Hope Partnership in order for them to develop it into a school.

In 1973, the United States Supreme Court decided *Comm. for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). In *Nyquist,* a New York law established financial aid programs for nonpublic elementary and secondary schools, including direct monetary grants to "qualifying" nonpublic schools that were to be used for the "maintenance and repair of . . . school facilities and equipment to ensure the health, welfare and safety of enrolled pupils." *Id.* at 761–62,, 93 S.Ct. at 2960, 37 L.Ed.2d at 956 (*citing* N.Y. Laws 1972, c. 414, § 1, amending N.Y. Educ. Law, Art. 12, §§ 549–53 (Supp.1972–73)). The law was challenged on Establishment Clause grounds. *Id.* The *Nyquist* Court, noting that "[p]rimary among those evils [protected against by the establishment clause] have been 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Id.* at 770, 93 S.Ct. at 2965, 37 L.Ed.2d at 962 (*citing Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), *Lemon*). Thus, in 1973, the Supreme Court found that Establishment Clause jurisprudence recognized that "sectarian schools perform secular, educational functions as well as religious functions, and that some forms of aid may be channeled to the secular without providing direct aid to the sectarian. But the channel is a narrow one . . . ." *Id.* at 775, 93 S.Ct. at 2967, 37 L.Ed.2d at 964. Accordingly, the Court found that New York's "maintenance and repair provisions violate the Establishment Clause because their effect, inevitably, is to subsidize and advance the religious mission of sectarian schools." *Id.* at 779–80, 93 S.Ct. at 2969, 37 L.Ed.2d at 967.

In *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the Court rejected an Establishment Clause challenge to a program providing sign-language interpreters to students, even those attending pri-

vate sectarian schools. In *Zobrest,* the Court stated that "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge." *Id.* at 8, 113 S.Ct. at 2466, 125 L.Ed.2d at 10. Thus, the primary beneficiaries were the children, not sectarian schools. *Id.* at 12, 113 S.Ct. at 2469, 125 L.Ed.2d at 13.

In 2002, in *Zelman v. Simmons–Harris,* 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), the United States Supreme Court distinguished *Nyquist,* and found that a program that provided an incidental benefit to religious schools while providing a broad benefit to all students without regard to whether they attended a sectarian or non-sectarian school did not violate the Establishment Clause. In *Zelman,* there was a challenge to an Ohio law which provided educational choices to lower income students in Cleveland's schools, which, at the time, were some of the worst schools in the nation. *Id.* The high Court found that the Ohio program was "neutral in all respects toward religion." *Id.* at 653, 536 U.S. 639, 122 S.Ct. at 2467, 153 L.Ed.2d 604.

While the Commonwealth Court is correct that *an* effect of this taking is to advance a religious organization's mission to provide faith-based educational services, this is clearly not the *principal or primary* effect. The principal or primary effect of the redevelopment plan in general, and this taking in particular, is to eliminate blight in this long-suffering neighborhood. *See, In re Condemnation by the Urban Redevelopment Auth. of Pittsburgh* at 446–47, 913 A.2d at 186–87. One secondary effect is the provision of quality non-denominational educational opportunities to low-income urban families in their own neighborhood. R. 125b. Another secondary effect could potentially be the advancement of religion; however, as far as we can tell from the record, all potential developers were treated in the same manner: They were permitted to indicate property contained within the large blighted area in North Philadelphia that they would be willing to develop. The development plans were reviewed for their potential to eliminate blight in the neighborhood and their conformance with

the broad pre-existing North Philadelphia Redevelopment Area Plan (adopted in 1968). Assuming the development plans conformed to the Redevelopment Plan, they were included in the 30th Amended Redevelopment Plan at issue in the instant case, and attempts were made to acquire the property. After acquisition, all property was transferred to the developer for nominal consideration. While the religious nature of the school is reason for this Court's careful review of the record, the facts before us indicate no goal aside from the elimination of blight and do not provide any indication that the principal or primary effect would be to advance religion. *See, Kelo, supra, Nyquist, supra, Zobrest, supra, Zelman, supra.*

The third prong of the *Lemon* test requires there to be no excessive entanglement between the state and a religious entity created by the government action. The Commonwealth Court found the instant facts to constitute excessive entanglement. We disagree. The Commonwealth Court has conflated the second and third prongs of the test. Basically, the Commonwealth Court found that because they believed the principal or primary effect of the transfer of the Property to Hope Partnership was the advancement of religion, then any relationship between the RDA and Hope Partnership constituted a joint effort that reflected excessive entanglement. *See In re 1839 N. Eighth St.,* 891 A.2d at 830. The Commonwealth Court ignores that entanglement is more than just mere interaction between government and religious entities. The United States Supreme Court has said that "[i]nteraction between church and state is inevitable and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391, 420 (1997) (*citing Bowen v. Kendrick,* 487 U.S. at 615–17, 108 S.Ct. 2562, 2577–78, 101 L.Ed.2d 520, 544–46 (1988) (periodic monitoring of counseling program set up by religious institution not excessive entanglement)); *Roemer v. Board of Public Works of Md.,* 426 U.S. 736, 764–65, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (annual

audits of religious colleges' use of grants not excessive entanglement).

The exercise of eminent domain to eliminate blight has been approved repeatedly by both this Court and the United States Supreme Court. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *Kelo v. City of New London, supra; In re Condemnation by the Urban Redevelopment Auth. of Pittsburgh, supra; Crawford, supra.* Therefore, we find that the subsequent sale of the Property to a private developer, even a developer who is a religious entity, does not constitute "entanglement" that would somehow make the taking unconstitutional.

For the reasons stated above, to the extent that the Commonwealth Court was correct when that court found it necessary to overrule what it believed to be the trial court's finding of waiver for Condemnee's failure to challenge the certification of blight, we affirm. In all other respects, we reverse and remand to the Commonwealth Court for a determination of any outstanding issues consistent with this opinion.

Chief Justice CAPPY and Justices CASTILLE, SAYLOR, EAKIN and FITZGERALD join the opinion.

Justice BAER files a dissenting opinion.

Justice BAER dissenting.

I respectfully dissent from the Majority's conclusion that taking private property through condemnation and transferring that property for nominal consideration to a religious partnership to develop a religious school does not have the principal effect of advancing religion. I believe that this government action provides direct aid to a religious school in violation of the Establishment Clause, and would therefore affirm the Commonwealth Court's holding that the taking was unconstitutional.

As part of a redevelopment plan in Philadelphia, the City of Philadelphia's Planning Commission certified as blighted the neighborhood that includes the property located at 1839 North

Eighth Street (the Property), in which Veronica Smith Howard lived with her mother, Mary Smith, the property owner (Appellee). There is no dispute that the Property and the surrounding neighborhood are blighted. The Hope Partnership requested that Philadelphia's Redevelopment Authority (RDA) acquire thirty-nine specific parcels in the neighborhood, including the Property, to transfer to the Hope Partnership to develop a nondenominational, faith-based school for children. The Hope Partnership described the venture as being between "[t]wo Communities of religious sisters, the Society of the Holy Child Jesus and the Sisters of Mercy. . . ." R.R. at 43, 47. It further explained that "[t]his collaborative venture is being built on the long established Holy Child and Mercy traditions of service, characterized by reverence, compassion, and belief in the life-changing power of education. As vowed religious, we are called to journey with those in need. . . ." *Id.* One of the purposes of the Sisters of Mercy, which is a Roman Catholic Order, is to operate schools devoted to education under the principles of commitment to God. The school that Hope Partnership seeks to run will be based on a model inspired by Judeo–Christian values that is nondenominational, but assumes the presence of God.

The RDA prepared a redevelopment proposal for the Planning Commission that included the acquisition for Hope Partnership, as well as numerous other nonreligious projects, such as building affordable housing, expanding existing businesses, and creating community gardens. The Planning Commission approved the proposal, and the Philadelphia City council approved the acquisition. Thirty-nine properties were identified for the Hope Partnership at a proposed acquisition cost to the RDA of $860,250.[1] After acquiring these properties, the RDA proposed to transfer them to the Hope Partnership below market value, for nominal consideration.

Appellee challenged the condemnation before the trial court, which held that the existence of blight justified the condemnation regardless of the specific developer's purpose for the

---

1. The RDA offered Appellee $12,000 as estimated just compensation for her property.

intended project. On appeal, Appellee argued that the RDA's condemnation violates the Establishment Clause of the First Amendment of the United States Constitution and Article 1, Section 3, of the Pennsylvania Constitution because the intended beneficiary of the condemnation is a purely private religious organization that intends to develop a religious school on the site.[2] The Commonwealth Court agreed, and reversed the trial court's grant of preliminary objections in favor of the RDA.

On appeal, the issue before this Court is whether the RDA may exercise eminent domain to condemn a private homeowner's property that was certified as blighted and then transfer that property for nominal consideration to a purely private religious organization to construct and operate a private religious school. As noted, this issue implicates the Establishment Clause and Article 1, Section 3, of the Pennsylvania Constitution.[3] To survive an Establishment Clause challenge, the state must demonstrate (1) that the government action serves a secular purpose; (2) that its principal or primary effect neither advances nor inhibits religion; and (3)

**2.** The Establishment Clause of the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion...." Similarly, Article I, Section 3, of the Pennsylvania Constitution provides that "no man may be compelled to attend, erect or support any place of worship, or to maintain any ministry without his consent...." We have held that "[t]he protection of rights and freedoms" secured by Article 1, Section 3, of the Pennsylvania Constitution "does not transcend the protection of the First Amendment of the United States Constitution." *Wiest v. Mt. Lebanon School Dist.*, 457 Pa. 166, 320 A.2d 362, 366–67 (1974).

**3.** The Majority indicates that Appellee does not rely on the Pennsylvania Constitution in this appeal and uses Appellee's failure in this regard to decline to address the Pennsylvania Constitution *sua sponte*. Respectfully, whether Appellee relied on the Pennsylvania Constitution does not determine whether this Court can address it. This Court can affirm on any basis. *Carrozza v. Greenbaum*, 591 Pa. 196, 916 A.2d 553, 569 (2007); *Craley v. State Farm Fire & Cas. Co.*, 586 Pa. 484, 895 A.2d 530, 532–33 (2006). Besides, Appellee does, in fact, rely on the Pennsylvania Constitution. *See* Appellee's Brief at 14–15. To the extent Article 1, Section 3, of the Pennsylvania Constitution is consistent with the Establishment Clause of the U.S. Constitution, our discussion in regard to the U.S. Constitution is equally apposite to the Pennsylvania Constitution. *See Wiest*, 320 A.2d at 367.

that it does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). All three of the *Lemon* test's requirements must be met before the act in question may stand. *Springfield School District v. Dept. of Edu.*, 483 Pa. 539, 397 A.2d 1154, 1158 (1979).

The Majority finds the taking constitutional premised upon its application of the three-prong *Lemon* test. Regarding the first prong, the Majority finds a secular purpose in the elimination of blight as established by the Urban Redevelopment Act. *See* 35 P.S. § 1702. Regarding the third prong, barring excessive entanglement between the state and a religious entity, the Majority concludes that the sale of property to a private developer, even a religious developer, does not constitute entanglement that would render the taking unconstitutional.

I agree with the Majority's conclusions regarding these two prongs of the *Lemon* test. However, I part ways with the Majority regarding the second prong because I disagree that the state has demonstrated that the government action's principal or primary effect neither advances nor inhibits religion. The Majority describes the government action as the taking of the Property, and concludes that one effect of the taking is to advance a religious organization's mission, but that this is not the principal or primary effect. Shifting gears and looking more broadly at the entire redevelopment plan, rather than the specific taking and transfer for the Hope Partnership, the Majority reasons that the principal or primary effect of the redevelopment plan is to eliminate blight in the neighborhood, while a secondary effect is the provision of quality religious educational opportunities and, potentially, the advancement of religion. The Majority reaches its conclusion in reliance on *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), and *Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).

I respectfully disagree. This case, like all other Establishment Clause cases, requires a careful examination of whether the government action violates any of the Establishment

Clause's prohibitions, including the "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (citing *Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). To answer whether the government action has the primary effect of advancing religion, the Supreme Court has drawn a consistent distinction between government programs that provide aid directly to religious schools, *see, Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality), *Agostini, supra; Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (collecting cases), and programs involving truly private choice, in which government aid reaches religious schools only by virtue of the independent choices of private individuals. *See Zelman,* 536 U.S. at 649, 122 S.Ct. 2460; *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); *Witters v. Washington Dept. of Servs. for Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Zobrest,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1.

Each time the Supreme Court has been faced with Establishment Clause challenges to private choice programs involving indirect aid to religious schools, the Court has rejected the challenge. In *Mueller,* the Court rejected an Establishment Clause challenge to a program authorizing tax deductions for educational expenses because the class of direct beneficiaries included all parents rather than specific schools. Similarly, in *Witters,* the Court rejected a challenge to a vocational scholarship program that provided tuition aid to a blind student who wished to use the grant to attend a Christian college and become a pastor, because the aid that ultimately flowed to religious institutions did so only as a result of the choices of the aid recipients. In *Zobrest,* the Court examined whether a deaf student was permitted, under the Establishment Clause, to bring his state-employed sign-language interpreter with him to a Roman Catholic School. The Court concluded broadly that government programs that neutrally provide benefits to classes of citizens without regard to their religion are not

readily subject to an Establishment Clause challenge. Finally, in *Zelman*, the challenged program provided tuition aid for certain students to attend participating public or private schools of their parent's choosing and tutorial aid for students who remained in public school. The Court held that because the aid reached the religious organizations only by way of the choices of the individual recipients, the incidental advancement of a religious mission is attributable to the individual aid recipients, not the government. In all of these cases, the Court emphasized that the student, not the religious school, was the intended beneficiary of the state aid, and that any money that ultimately went to the religious institution did so as an incidental result of private choices. *See also Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (rejecting a challenge based on the Establishment Clause to a program placing full-time public employees on parochial campuses to provide secular instruction, because the provision of the instructional services was available only to the students at whatever school they chose to attend, and do not relieve sectarian schools of costs they would otherwise bear).

In contrast to these indirect aid cases, special Establishment Clause dangers exist when aid is given directly to religious schools. *Mitchell*, 530 U.S. at 820, 120 S.Ct. 2530. Unlike the Majority, I find no analogy between this case and cases detailed above involving indirect private choices. Rather, I believe this is a case of direct government aid, in the form of a land transfer below market value to a religious organization for the development of a religious school. The state action here is neither directed at, nor directly benefits, individual students without regard to where they choose to apply the aid. Instead, the aid here is essentially a land grant, directly to the religious school, as a consequence of state decision-making.

Appellee relies on two cases concerning direct aid to religious schools, which I agree are more germane to the facts *sub judice*. *See Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality); *Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948. In *Tilton*, the Court rejected a

plan that provided federal grants directly to both religious and secular institutions for construction of academic facilities. The plan in question required assurances from religious beneficiaries of the plan that, for twenty years, the facilities would not be used for sectarian purposes, subject to a right of recapture in the event that they were so used. At the end of twenty years, however, the restrictions and right of recapture would lapse. Although the opinion was not a majority, the Justices unanimously agreed that the lack of restriction and a recapture right after twenty years violated the Establishment Clause by leaving a religious institution with something of substantial value, given by the government, in which the beneficiaries were permitted to forward religious interests.[4]

In *Nyquist*, the challenged government action authorized direct payments to nonpublic religious schools for maintenance and repair without restricting payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes. Although the program was enacted for ostensibly secular purposes as part of a broader plan encompassing nonpublic schools serving low-income families, the Court found that the program's function was "unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* at 783, 93 S.Ct. 2955. A majority of the Court struck down the law, concluding that because the grants were given without restriction on usage, it was possible for schools to finance their entire maintenance and repair budget from state tax-raised funds, and nothing prevented the schools from paying out of state funds the salaries of employees who, for example, maintained the school chapel. Absent appropriate restrictions on expenditures, the Court concluded that "it simply cannot be

---

**4.** Chief Justice Burger, joined by Justices Harlan, Stewart, and Blackmun concluded that the restrictive obligations of a recipient institution cannot constitutionally expire while the building has substantial value, and severed this portion of the Higher Education Facilities Act of 1963. *See Tilton*, 403 U.S. at 683–84, 91 S.Ct. 2091. Justices Douglas, Black, and Marshall agreed that the reversion of the facility to the religious school at the end of twenty years was a grant from taxpayer funds that was plainly unconstitutional, but they saw constitutional infirmities in the statute as a whole. *Id.* at 692–93, 91 S.Ct. 2091. Justice White concurred in the result.

denied that [the maintenance and repair provision] has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools." *Nyquist,* 413 U.S. at 774, 93 S.Ct. 2955.

In the instant case, the RDA paid, from the public treasury, an acquisition cost of $860,250 for the thirty-nine parcels of land it intends to transfer to the Hope Partnership for nominal consideration. The Hope Partnership, a religious partnership, intends to develop a religious school on the property to advance Judeo–Christian values. The RDA is, therefore, essentially gifting land to a religious organization. It is not clear what the value of this gift is, but it cannot be disputed that the difference between the $860,250 paid by the RDA and "nominal" cost paid by the Hope Partnership represents substantial aid, or direct financing of religious education, with the primary effect of advancing religion. *Cf. Everson v. Board of Edu.,* 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947) ("No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they adopt to teach or practice religion.").

Further, the transfer of land to the religious organization will be given without restriction on usage. If tax-raised-funds may not be granted to institutions of learning where the possibility exists that those funds will be used to construct a facility utilized for sectarian activities twenty years hence, *see Tilton,* and they may not be distributed to sectarian schools for the maintenance and repair of facilities without limitation on their use, *see Nyquist,* it follows that they cannot be used to purchase land to give outright to a religious institution to develop a sectarian school.[5]

Appellant and the Majority defend the vastly below-market-value transfer of land to the Hope Partnership by focusing on its inclusion in a broader redevelopment plan. I disagree that providing direct aid to a religious school as part of a redevel-

5. Of course, Hope Partnership, may, consistent with the Establishment Clause, participate in the redevelopment of a blighted area so long as it pays fair market value for the land it acquires.

opment plan that also benefits secular organizations shields it from constitutional scrutiny. In *Tilton,* the direct aid to private schools was provided pursuant to an aid program that required assurances, for twenty years, that no part of the project would be used for sectarian instruction or other religious activity. Congress intended the program to benefit all colleges and universities regardless of any affiliation with or sponsorship by a religious body. *Id.* at 676, 91 S.Ct. 2091. This secular intent and inclusion of nonreligious schools was nevertheless insufficient to save the program from the Court's unanimous conclusion that the expiration of the government's restrictions and recapture right rendered the program unconstitutional because it left the religious school with unrestricted use of valuable property.

I also note my disagreement with the Majority's discussion of viewpoint discrimination. The Majority argues that to bar the Hope Partnership from participating in the redevelopment of a blighted area where all other entities are permitted to participate, solely on the basis of the Partnership's religious views, would likely constitute viewpoint discrimination. Majority Opinion at 252–53, 938 A.2d at 348, citing *Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) and *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Although the Majority does not develop the basis for its position, it apparently believes that requiring fair market value from a religious organization, where such is not required from nonreligious parties, amounts to an unconstitutional discrimination on speech on the basis of viewpoint. *See Good News Club,* 533 U.S. at 106–107, 121 S.Ct. 2093; *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510. I respectfully, but resolutely reject this as sophistry. *Rosenberger* and *Good News Club* involve, respectively, forums for public expression such as school facilities that are opened for after-school activities or for use by non-government organizations; or government-funded subsidies for student publications. In such cases, a sectarian/religious activity or publication cannot, consistent with the Free Speech clause of the First Amendment,

be excluded from an otherwise open forum or subsidy program directed at a expressive medium solely on the basis of sectarian/religious content.

This reasoning is irrelevant, however, in a situation where there is no forum for speech. In *Locke v. Davey*, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), the Court refused to strike down a state constitutional prohibition barring the grant of state scholarship aid to students majoring in devotional theology, rejecting the argument that such a ban was viewpoint discrimination. The Court reasoned that the scholarship program is not a form for speech, and its purpose, to assist students from low and middle income families with the cost of postsecondary education, was not "to encourage a diversity of views from private speakers." In so concluding, the Court pointedly distinguished cases dealing with speech forums as inapposite. Similarly, the Urban Redevelopment Law is not a forum for speech; its purpose, to eliminate blight, is not to encourage a diversity of views from private speakers. Viewpoint discrimination is not implicated where the issue does not implicate access to a forum for speech. To find, as the majority suggests, that withholding public funds from a religious school amounts to viewpoint discrimination would create an inherent conflict between the First Amendment's establishment and expression aspects, causing the government to choose which aspect to vindicate, and which to violate, a result that finds no support in any legal authority. Accordingly, it is no answer to the foregoing *Lemon* analysis to suggest that it leads to unconstitutional viewpoint discrimination.

For all the stated reasons, I strongly dissent to what I view as an unfortunate decision by this Court.