In Re: Condemnation by the                    :
Commonwealth of Pennsylvania,                  :
Department of Transportation, of               :
Right-of-Way of State Route 0443,              :
Section 02S, in the Township of                :
Mahoning                                       :
                                               :
Commonwealth of Pennsylvania,                  :
Department of Transportation                   :
                                               :
              v.                               :
                                               :
Bennett Family Properties, LLC,                :    No. 218 C.D. 2020
                    Appellant                  :    Argued:  April 12, 2021


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge (P.)
           HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COVEY                                    FILED:  May 10, 2021


         Bennett Family Properties, LLC (BFP) appeals from the Carbon County Common Pleas Court's (trial court) January 21, 2020 order overruling BFP's preliminary objections (Preliminary Objections) to the Commonwealth of Pennsylvania, Department of Transportation's (PennDOT) Declaration of Taking (Declaration).  BFP presents two issues for this Court's review: (1) whether the trial court erred and abused its discretion by prohibiting testimony supporting BFP's claims that PennDOT failed to conduct a suitable investigation and reach an intelligent, informed decision before it filed the Declaration; and (2) whether the trial court incorrectly interpreted PennDOT's duties under the Eminent Domain Code

(Code)[1] and case law, where uncontroverted evidence supports the trial court's assertion that PennDOT failed to satisfy those duties. After review, this Court affirms.

On December 12, 2018, PennDOT filed the Declaration with respect to three undeveloped BFP-owned real estate parcels located adjacent to State Route 0443 (State Route 443) in Mahoning Township (BFP Property). *See* Reproduced Record (R.R.) at 1a-11a. PennDOT claimed the taking of the parcels was necessary for a road widening project on State Route 443 (Project). On January 11, 2019, BFP filed the Preliminary Objections, asserting that PennDOT abused its discretion in failing to undertake a suitable investigation and/or make an intelligent, informed judgment regarding the taking, and PennDOT's appropriation of the BFP Property was an excessive taking. *See* R.R. at 15a-20a.

On October 17, 2019, the trial court held a hearing on BFP's Preliminary Objections. BFP presented the testimony of Joseph J. Bennett (Bennett), a BFP principal, and Gregory Haas (Haas), a licensed professional engineer as BFP's expert witness.

Bennett testified that BFP purchased the BFP Property in 2017, intending to develop it for commercial use. Bennett explained that he had communications with a fast food corporation's representatives regarding developing the BFP Property as a fast food restaurant. Bennett further reported that, in May 2018, he learned PennDOT was considering taking the BFP Property for stormwater retention basins (basins/retention ponds). Bennett stated that, after acquiring this information, he and his engineer met with PennDOT representatives regarding his development plans and suggested that the proposed basins would be better located on an adjacent property off of Route 443. Bennett expounded:

---

[1] 26 Pa.C.S. §§ 101-1106.

[M]y presentation to [PennDOT] was that the whole purpose for which [it is] widening [State Route] 443 is to allow better access without backing up traffic to all [of] these parcels on both sides of the street from the bridge out to Walmart, the McCall Bridge out to Walmart.

So why put [basins] in[?] Nobody's going to drive into a [basin], but they are going to drive into a KFC or a Wendy's.

R.R. at 170a. Bennett continued:

And we talked at that time about giving [PennDOT] an easement to bring the piping for [the basins from which it would] have been taking water off of [State Route] 443. Taking that water and taking it through [the BFP P]roperty and putting it in the back. So that land is less expensive. And it seemed like a viable alternative rather th[a]n buying my frontage. Buy inexpensive property in the back that would [allow] gravity [to] flow right to [it] for the placement of the [basins].

R.R. at 171a. Bennett recalled that, approximately one month later, PennDOT rejected his request.[2] Bennett learned that PennDOT had elected to take the BFP

---

[2] On June 12, 2018, PennDOT's Engineering District 5-0 Assistant District Executive - Design, Christopher J. Kufro, P.E. (Kufro), explained to Bennett that PennDOT had evaluated his request regarding the proposed stormwater basin relocation, but rejected the request for the following reasons:

- The current configuration and size of the stormwater basins would not fit on the back parcel, and smaller basins would not comply with the Department of Environmental Protection requirements;

- The previously approved environmental document would have to be reevaluated;

- Additional wetland delineation and other environmental studies would be required;

- Additional infiltration tests would have to be performed to verify the basins' functionality; and

- Drainage design would need to be reconfigured.

*See* R.R. at 345a. Kufro further communicated that "[t]hese issues would result in a serious delay to the design schedule and start of construction as the environmental process and permit would have to be reassessed." *Id*.

Property when he received a December 14, 2018 letter from PennDOT enclosing the Declaration.

During Bennett's testimony, PennDOT's counsel raised an objection to Bennett's reference to his intended plans for the BFP Property and the BFP Property's highest and best use, arguing that such testimony was not relevant at the proceeding's preliminary objection stage. After discussing the issue with both counsel, during which PennDOT's counsel stipulated that the BFP Property's highest and best use was for commercial use purposes, the Court sustained PennDOT's objection and precluded Bennett's testimony on BFP's intended use beyond the stipulation that, but for the taking, BFP would have used the BFP Property for commercial purposes. *See* R.R. at 155a-160a.

BFP's counsel also sought to present expert testimony from licensed appraiser Lisa Foreback (Foreback) about the BFP Property's highest and best use and the resulting impact of the taking. After a lengthy discussion with counsel, the trial court similarly precluded Foreback's testimony.

Haas testified on BFP's behalf that, after examining PennDOT's plans, he concluded that the BFP Property need not be taken, since the proposed basins could be placed on property located behind and north of the BFP Property (Sergentakis Properties). On cross-examination, Haas acknowledged that the purpose of the basins would be to mimic the natural drainage runoff but for the development. *See* R.R. at 184a. Haas admitted that his firm had not done any testing on the Sergentakis Properties to see if they were suitable for the basins. *See* R.R. at 192a. He did not know whether PennDOT's proposed basins would mimic the natural drainage because he did not thoroughly review the report. When asked if the basins he proposed on the Sergentakis Properties would mimic the drainage but for the improvements, Haas responded: "Possibly." R.R. at 194a. He also admitted that to relocate the basins to the Sergentakis Properties, PennDOT would need to install

4

piping from State Route 443 to the infiltration basin, a considerable distance farther away, and then install additional piping from the Sergentakis Properties to Mahoning Creek, thereby affecting five private properties. *See* R.R. at 194a. Haas acknowledged that PennDOT would be required to maintain and/or obtain rights-of-way over the five properties and that he did not perform a cost analysis regarding any aspect of his proposal. *See* R.R. at 195a.

PennDOT's Engineering District 5 Right-of-Way Administrator Kenneth Kutchinsky (Kutchinsky) and its Design Engineer Joseph DiGirolamo (DiGirolamo) testified for PennDOT. Kutchinsky explained:

> The [P]roject[] [is] basically[] a safety project along the corridor. Widening, upgrade of the shoulders, drainage to better facilitate the traffic through the corridor. Upgrading of some of the driveways also along the corridor to provide a designated access point to the properties as opposed to wide open free access.
>
> So it's a safety project to install a center turn lane, as well as upgrade shoulders and improve the access points to the property -- adjacent properties.
>
> . . . .
>
> [S]torm water management is something that [PennDOT] has to address when [it's] doing [its] projects. . . .
>
> There's in[-]depth engineering that goes on with what [PennDOT] call[s] preliminary engineering that starts early on in the project to, let's just say, 1,000 feet have a look at the corridor, get an idea of what [it] can and cannot do. Analyze alternatives. Go through a process of elimination.
>
> And then progress into what [PennDOT] calls final design, which the right-of-way acquisition is in what [it] call[s] the final design phase.

R.R. at 212a.

5

Kutchinsky recalled that PennDOT began studying the possibility of a highway safety improvement project on State Route 443 as far back as 2013. PennDOT started the Project's preliminary design in 2014 and completed it in 2016. Thereafter, the preliminary plans were presented to the public for feedback.

DiGirolamo explained the extensive considerations involved in developing PennDOT's preliminary design:

> So during preliminary design there's several matters that we take in it. One, is we look at the roadway, we design our roadway to meet all of the safety requirements. This was a safety improvement project. So . . . we wanted to make sure that, you know, we address all the concerns of a normal typical highway project. That's . . . repaving the road, reconstruction of the road. This [P]roject actually had two structurally[-]deficient bridges that were replaced. One[] is a full replacement and one's a superstructure replacement.
>
> I look at storm water management. We look at access. We look [at] guide rail utility relocations[.]
>
> . . . .
>
> Because of the linear nature of the [P]roject we have 2.2 miles. So we have to address storm water management for the entire [P]roject. So we look at the entire [P]roject. And, you know, starting from Ashtown Drive, you know, we, kind of, break the [P]roject up into basic drainage areas that are discharging and where they're discharging to[,] so we can maintain those.
>
> So as you work your way through the [P]roject, you have Ashtown Drive and then the big block where the development is. That's called Carbon Plaza. So that was one drainage area or discharge point. Then you have from Carbon Plaza down to the Mall Lane, that was another one, which is [sic] the next roads that go north and south. Then from that point all the way to the 902 bridge, which is you can kind of see it. It goes off to the north. And then from the 902 bridge to the 440 - or to -- sorry. Mall Lane -- or not Mall Lane. Mahoning Mountain Road, East Penn. That was another area. And then from Mahoning

6

> Mountain Road, East Penn to the [State Route] 443 bridge. And then from the [State Route] 443 bridge all the way to the [State Route] 209 intersection.
>
> . . . .
>
> We evaluate every option that we can. And, you know, we take into consideration, you know, a lot of environmental issues that come with. You have, you know, wetlands, where the stream[ i]s located, where the discharge point[ i]s located, whether there's threatened endangered species, whether there's hazardous materials on sites.
>
> . . . .
>
> So that happens during preliminary design. So we layout our basins. Preliminary, basins, we lay them out. And then that establishes where we're going to do our testing.

R.R. at 251a-253a. DiGirolamo recalled:

> During that preliminary design, it was determined that one of the basins wasn't viable to the -- our soil testing. And that was, actually, just to the east of the - [] Bennett's -- actually, [the adjacent] Rudelitsch property. It was just east of Mr. -- or Ms. Rudelitsch's -- Rudelitsch property. And then we had to slide the basins to the west. And then we did additional testing after preliminary design and final design. And that's the current configuration shown here.

R.R. at 256a.

In response to Bennett's alternate proposal, and Haas's evidence, DiGirolamo described:

> We'd have about, I think [] Haas testified, about 1,500 linear feet of additional pipe. [PennDOT is] going to need drainage easements[;] [PennDOT is] going to need access easements. [PennDOT is] going to need to purchase some more land and fee take. And also you're going to have to get it environmentally cleared. Make sure there's no, you know, artifacts. And, you know, there's no threatened, endangered species. There's nothing else that precludes us. Any wetlands impacts [sic].

7

R.R. at 267a-268a. DiGirolamo estimated that it would take PennDOT approximately one year and cost approximately $200,000.00 to conduct the necessary studies, with additional time to obtain the necessary permits. *See* R.R. at 268a.

According to DiGirolamo, based on the topography on the opposite side of State Route 443 from the BFP Property, PennDOT determined that the likely natural drainage area would be at or near the BFP Property and that the plans adequately mimicked the natural flow of water absent the development. *See* R.R. at 259a. Further, wetlands and a stream were located nearby and were more easily accessible from the BFP Property. *See* R.R. at 260a-261a. Therefore, from the preliminary design through the final design, PennDOT determined that the BFP Property was the most suitable property for the discharge. *See* R.R. at 261a, 263a.

PennDOT's witnesses also testified that, after a May 10, 2018 meeting with Bennett, PennDOT representatives accompanied Bennett and his engineers to the BFP Property to view the site's physical characteristics. *See* R.R. at 218a-219a. The witnesses testified that PennDOT did consider Bennett's alternative proposal, but rejected it after determining that it would not be suitable for PennDOT's needs.

On January 21, 2020, the trial court found that PennDOT's decision to take the BFP Property "was well thought out and planned and clearly an intelligent, informed judgment exercised by PennDOT and not an abuse of discretion . . . ." Trial Ct. Op. at 10. Further, the trial court found that the taking was not excessive. *See id*. Accordingly, it overruled BFP's Preliminary Objections. BFP appealed to this Court.[3]

---

[3] "An appellate court's review of a trial court's decision to sustain or overrule preliminary objections to a declaration of taking 'is limited to a determination of whether the trial court abused its discretion or committed an error of law.'" *In re Condemnation by Dep't of Transp. of Right-of-Way for State Route 0022, Section 034 in Twp. of Frankstown*, 194 A.3d 722 n.8 (Pa. Cmwlth. 2018) (quoting *In re Redevelopment Auth. of the City of Phila.*, 938 A.2d 341, 345 (Pa. 2007)).

In 1866, our Supreme Court explained that the Commonwealth's right "to take private property without the owner's assent on compensation made . . . exists in her **sovereign right** of eminent domain . . . . The power arises out of that natural principle which teaches that **private convenience must yield to the public wants**." *Appeal of Lance*, 55 Pa. 16, 25 (1866) (emphasis added). The Supreme Court restated, in 1913, that the power of eminent domain "is an attribute of sovereignty, and **every private owner holds his property subject to the right of the sovereign** to take the same, or such part of it as may be required to serve the public use." *Phila. Clay Co. v. York Clay Co.*, . . . 88 A. 487, 487 ([Pa.] 1913) (emphasis added). "The power is not necessarily created either by Constitution or statute, but **is an inherent attribute of sovereignty itself**." *Id*. at 488 (emphasis added). Even the United States Supreme Court has stated that there can be no "doubts [as to] the existence in the [s]tate governments of the right to eminent domain, - a right distinct from and paramount to the right of ultimate ownership. It grows out of the necessities of their being, not out of the tenure by which lands are held." *Kohl v. United States*, 91 U.S. 367 . . . (1875).

These pronouncements are not premised on the Commonwealth having an existing or prior interest in the property it seeks to condemn - rather, the power of eminent domain is inherent in the Commonwealth as a sovereign. This power, like the power of taxation and the police power, "exist[s] because the state exists"; "[t]hey are not rights reserved," but "rights inherent in the state as sovereign." *In re Condemnation of 110 Wash. St.*, 767 A.2d 1154, 1158 (Pa. Cmwlth. 2001) (quoting *People v. Adirondack Ry. Co.*, 160 N.Y. 225, 54 N.E. 689, 692 (1899), *aff'd sub nom. Adirondack Ry. Co. v. N*[.] *Y*[.], 176 U.S. 335 . . . (1900)).

*In re Condemnation by Dep't of Transp. of Right-of-Way for State Route 0022, Section 034 in Twp. of Frankstown*, 194 A.3d 722, 730-31 (Pa. Cmwlth. 2018) (*Twp. of Frankstown*).

Further,

a sovereign may exercise the power of eminent domain "when legislative action points out the occasions, the modes and the agencies for its exercise[,]" and "the legislature may grant exemptions in connection with the exercise thereof . . . ." [*In re Legis. Route 1018, Section 4, Lower Chichester Twp., Del. Cnty.*], 222 A.2d [906,] 908 [(Pa. 1966)]. Article I, [S]ection 10 of the Pennsylvania Constitution provides, in pertinent part, that "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. Thus, the Pennsylvania Constitution authorizes the exercise of eminent domain for acquiring property for public use with the payment of just compensation. Section 2003(e)(1) of The Administrative Code of 1929[4] authorizes [PennDOT]

> [t]o acquire, by . . . condemnation . . . , land in fee simple or such lesser estate or interest as it shall determine, in the name of the Commonwealth, for all transportation purposes . . . and to erect on the land thus acquired such structures and facilities . . . as shall be required for transportation purposes.

71 P.S. § 513(e)(1). Transportation purposes include "reconstructing, repairing and maintaining [s]tate designated highways and other transportation facilities[.]" *Id.* We have held that

> if the purpose of the condemnation is in furtherance of [PennDOT's] responsibility to provide a fast, safe and efficient transportation system in the Commonwealth with due regard to public health and safety, then [PennDOT] has the authority and the duty to proceed with that condemnation if it is incidental to the reconstruction, repair or maintenance of a [s]tate designated highway.

---

[4] Act of April 9, 1929, P.L. 177, *as amended.*

10

> *Appeal of Corcoran*, . . . 537 A.2d 384, 385 ([Pa. Cmwlth.]
> 1988) (footnote omitted).

*Twp. of Frankstown*, 194 A.3d at 731-32.

"[T]he purpose of the [Code] is to provide the procedure for the exercise of the sovereign's inherent power to condemn property for public purposes, not to deprive property owners of property." *In re Condemnation by Dep't of Transp. of Right-of-Way for State Route 0095, Section BSR*, 131 A.3d 625, 633 (Pa. Cmwlth. 2016). "[P]rovisions conferring the power of eminent domain must be strictly construed." *In re Sch. Dist. of Pittsburgh, Allegheny Cnty.*, 244 A.2d 42, 44 (Pa. 1968).

"[A] condemnation proceeding . . . encompasses two distinct proceedings. The first goes to the propriety and validity of the taking, including whether a taking has been effected [(i.e., preliminary objections)]. The second goes to damages [(i.e., petition to appoint board of viewers)]." *Phila. Redevelopment Auth. v. Atuahene*, 229 A.3d 1002, 1007 (Pa. Cmwlth. 2020) (quoting *Petition of Ramsey*, 375 A.2d 886, 888 (Pa. Cmwlth. 1977)). "Preliminary objections in eminent domain proceedings are different from those in other proceedings. Preliminary objections are the sole method by which a condemnee may challenge the declaration of taking."[5] *In re Condemnation Proceeding by S. Whitehall Twp. Auth.*, 940 A.2d 624, 627 n.2 (Pa. Cmwlth. 2008); *see also* Section 306(a) of the

---

[5] This Court has stated:

> Section 306(a)(3) of the Code provides that preliminary objections shall be limited to and shall be the exclusive method of challenging: (i) the power or right of the condemnor to appropriate the condemned property unless it has been previously adjudicated; (ii) the sufficiency of the security; (iii) the declaration of taking; and (iv) any other procedure followed by the condemnor. 26 Pa.C.S. §[] 306(a)(3).

*In re Condemnation No. 2 by Cmwlth. ex rel. Dep't of Gen. Servs.*, 943 A.2d 997, 1000 (Pa. Cmwlth. 2007).

Code, 26 Pa.C.S. § 306(a). Thus, "[i]n eminent domain cases, preliminary objections are intended as a procedure to resolve expeditiously the factual and legal challenges to a declaration of taking before the parties proceed to determine damages." *Twp. of Millcreek v. Angela Cres Tr. of June 25, 1998*, 142 A.3d 948, 951 n.2 (Pa. Cmwlth. 2016). For this reason, "[t]he question of damages simply has no relevance when preliminary objections are filed." *Appeal of Dep't of Transp.*, 605 A.2d 1286, 1291 (Pa. Cmwlth. 1992).

"[A] trial court is limited in its review of a decision to condemn property and of the extent of the taking to determining whether the condemnor is guilty of fraud, bad faith, or has committed an abuse of discretion." *Appeal of Waite*, 641 A.2d 25, 28 (Pa. Cmwlth. 1994). "The burden of proving that the condemnor has abused its discretion is on the objector or condemnee, and that burden is a heavy one because, in such cases, there is a strong presumption that the condemnor has acted properly." *In re Condemnation No. 2 by Cmwlth. ex rel. Dep't of Gen. Servs.*, 943 A.2d 997, 1002 (Pa. Cmwlth. 2007).

Moreover,

[a] court has 'no power to substitute [its] discretion for that of the [condemnor], nor to correct mistakes in judgment. It is presumed that the officials have performed their duties in good faith. . . .' *Swartz v. Pittsburgh Pub*[.] *Parking Auth*[.], . . . 439 A.2d 1254, 1256 ([Pa. Cmwlth.] 1981). Mere evidence that a decision is unwise will not warrant a conclusion that a condemnor has abused its discretion in its selection of a site.

*Downingtown Area Sch. Dist. v. DiFrancesco*, 557 A.2d 819, 821-22 (Pa. Cmwlth. 1989).

Notwithstanding, the Pennsylvania Supreme Court has declared:

[T]he government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification. In [*School District of Pittsburgh*],

12

. . . 244 A.2d [at] 46 [], this Court held that "[**u**]**nless the property is acquired for an authorized public use**, **and after a suitable investigation leading to an intelligent**, **informed judgment by the condemnor**, **the condemnation is invalid**." Likewise, in *Pidstawski v. South Whitehall Township*, . . . 380 A.2d 1322, 1324 ([Pa. Cmwlth.] 1977), a [t]ownship's taking was upheld because rather than being arbitrary, the record demonstrated that it was "carefully planned and painstakingly thought out with a view toward present and future requirements." Moreover, the United States Supreme Court placed great weight upon the existence of a "carefully considered" development plan in order to rule that the taking in *Kelo v. City of New London*, 545 U.S. 469 . . . (2005)[,] was not pretextual, but for a proper purpose. Additionally, a plan to take must be tailored to the actual purpose or it will be overturned as excessive. This occurred in *Winger v. Aires*, . . . 89 A.2d 521 ([Pa.] 1952), when our Court held that a taking of 55 acres for the public purpose of building a school was an abuse of discretion because it was excessive for its purpose. *Id.* at 523 (internal citations omitted). Clearly, evidence of a well-developed plan of proper scope is significant proof that an authorized purpose truly motivates a taking.

*Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 338 (Pa. 2007) (emphasis added). Accordingly, pursuant to *Middletown Township*, and the cases cited therein, a taking must be for an authorized use, follow a "suitable investigation leading to an intelligent, informed judgment[,]" and be a "well-developed plan of proper scope[.]" *Id.* However, a condemnor "is not required to follow any set criteria in choosing a . . . site. All that is required is that an investigation be conducted so that the decision to condemn is an informed judgment." *Downingtown Area Sch. Dist.*, 557 A.2d at 822.

BFP first argues that the trial court erred and abused its discretion when it excluded a significant portion of Bennett's testimony and precluded Foreback's testimony regarding the BFP Property's highest and best use because, in doing so, it prevented BFP from presenting evidence demonstrating that PennDOT failed to

13

meet its burden to establish it made a suitable investigation leading to an intelligent, informed judgment that the taking was necessary.[6]  According to BFP, "Bennett and Foreback intended to offer fact and expert testimony regarding highest and best use of the [BFP Property] **for the purposes of demonstrating that PennDOT failed to meet its burden to establish it made a suitable investigation leading to an intelligent**, **informed judgment that the taking was necessary**."  BFP Br. at 25 (emphasis added).

> The Pennsylvania Supreme Court has explained:
>
> [Evidentiary decisions made by the trial court] are reviewed for an abuse of discretion.  *See Commonwealth v. Wright*, . . . 78 A.3d 1070, 1086 ([Pa.] 2013).  An abuse of discretion occurs where the trial court "reaches a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will."  *Id*. at . . . 1080.

*Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015); *see also Daddona v. Thind*, 891 A.2d 786, 811 (Pa. Cmwlth. 2006) ("The decision whether to admit or exclude the testimony of a witness is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.").

At the hearing, PennDOT objected to Bennett's testimony regarding his plans for the BFP Property.  The trial court questioned BFP's counsel as follows:

> THE COURT: [BFP counsel], how is it relevant?
>
> [BFP's counsel]: . . . .  In our brief in support of our [P]reliminary [O]bjections, we advised the [c]ourt that we believe that PennDOT has an obligation to make an intelligent, informed judgment prior to making a taking. And it's our intent today to prove to Your Honor that had [it] done so, [] Bennett would be able to proceed with his commercial development.

---

[6] BFP did not dispute that the taking was for a public purpose.  *See* R.R. at 204a.

And instead, [PennDOT] decided to take [the BFP Property] for purposes that don't support the highest and best use of the [BFP P]roperty. And I have [] Bennett, who is going to testify and two other expert witnesses that we believe will establish for your court that had PennDOT taken a little more time and a little more care, commercial development along [State Route] 443 would be pursued by [] Bennett as opposed to the proposed use by PennDOT.

[PennDOT's counsel]: And, Your Honor, I think on behalf of my client, *we can stipulate that the highest and best use of* [*the BFP Property*] *prior to the condemnation would have been for future commercial development*. Again, that's going to go to if there's further litigation by means of petition for the board of view[ers]. That's going to the ultimate decision of damages. Not to whether or not [the BFP Property] was needed for this [P]roject.

[BFP's counsel]: *Whether they stipulate to the fact that . . . a commercial use is the highest and best use, it still goes to the fundamental question of the constitutional rights that my client has, which is the right to own and develop* [*its*] *property*. And I think that the court is going to be presented with a substantial amount of evidence that demonstrates that *there are other alternatives to accomplish* [*its*] *goal*.

And those other alternatives would be less harmful to [] Bennett and would provide him with the opportunity to develop [the BFP Property]. This isn't about money damages, Your Honor. This is not the hearing for that. *This is the hearing where we believe that* [] *Bennett's constitutional rights are being trampled upon by PennDOT's failure to investigate other alternatives*. And we intend to prove that today, Your Honor.

THE COURT: *Well what difference does it make whether it's going to be for constructing a KFC, or an office building, or anything of that nature as it relates to the obligation of* [*PennDOT*] *to undertake an informed investigation to make intelligent, informed judgments*?

. . . .

[BFP's counsel]: I think that the -- I would agree with Your Honor that the proposed use is not as relevant as the

15

-- so whether it would be a fast food restaurant or whether it would be an office building, I would agree with Your Honor. That distinction is not all that relevant. I'm merely providing you with background as to how [Bennett] was going to develop this.

Ultimately, it was going to be for commercial purposes. We believe that that's the highest and best use. Not as [r]etention ponds. [State Route] 443 is a commercial thoroughfare. And [PennDOT has] proposed to use [the BFP Property] to install [r]etention ponds.

THE COURT: *How does the issue of highest and best use come into the obligation* [*PennDOT*] *has*?

[BFP's counsel]: Because *if* [*PennDOT*] *had done a little more work*, which we're about to establish for Your Honor, [*it*] *would have been able to determine there's a property immediately adjacent to* [*the BFP Property*] *that could have been used for the very same* [*r*]*etention pond*[*s'*] *use and still allow* [] *Bennett to continue to use* [*the BFP Property*] *for commercial development*.

And so when it comes time to evaluating whether PennDOT has made an intelligent and informed decision, we believe that the compelling evidence will be that [it] ha[s] not. And that, therefore, the [P]reliminary [O]bjections should be granted.

[PennDOT's counsel]: And, Your Honor, briefly, as I understand [*BFP counsel's*] *argument, essentially is because* [*the BFP Property*] *may be more valuable than a neighboring property, go place the* [*r*]*etention pond*[*s*] *on some drainage facility somewhere else*. Is -- so that adds to his argument. And [PennDOT] doesn't have to show that.

[*PennDOT has*] *to show what* [*it is*] *doing is a valid transportation purpose for the support of the highway. And our testimony will be clear that* [*PennDOT has*] *investigated the* [*BFP P*]*roperty for a period of years before determining the location for these*. And that [is] why that location is the better choice than the one [BFP is] going to propose including the fact that there's been no testing whatsoever to support that these drainage facilities can go on the property that [BFP is] speaking about.

16

THE COURT: [BFP's counsel] has responded insofar as arguing that you must use -- [PennDOT] must consider the highest and best use of [the BFP Property] as it relates to making this informed judgment. *Is that what the caselaw requires*?

[PennDOT's counsel]: *No, Your Honor. The highest and best use is an analysis that comes into play when we talk about getting what [BFP is] constitutionally entitled to once a transportation purpose has been established and the taking occurs, [BFP's] constitutional right is to a just compensation. And the factor of just compensation is the highest and best use for which the [BFP P]roperty can be put.*

[PennDOT is] not disputing that that's for future commercial development. And that -- that would be, again, if a petition for board of view[ers] is filed as a result of this action, that would be left initially for a board of view[ers] to determine. And then potentially for a jury.

THE COURT: I'm going to sustain the objection as to any testimony on the highest and best use and any other -- anything beyond the stipulation that [PennDOT's counsel] has presented with regard[] to agreeing that [the BFP Property] would have been, had it not been for the taking, utilized by [BFP] for commercial use.

R.R. at 155a-160a (emphasis added).

Similarly, BFP asserts that "Foreback would have testified as to evidence concerning the adverse economic impact that PennDOT's condemnation of the [BFP Property] has, and importantly, to demonstrate the **lack of genuine effort** by PennDOT **to seek a reasonable alternative to the taking of the** [**BFP**] **Property**." BFP Br. at 24-25 (emphasis added). The following exchange occurred at the hearing when BFP's counsel attempted to present Foreback's testimony:

[BFP's counsel:] [Foreback] is going to talk about highest and best use of the [BFP P]roperty and the magnitude of the highest and best use and this taking. And the result that this taking has.

17

I think Your Honor can only determine whether [PennDOT] has generally made a suitable investigation and [] made an intelligent and informed decision. I don't think you could reach that conclusion unless you know the magnitude of the impact that this taking is having. And that's why I would like to call my third witness, despite the stipulation as to commercial zoning and highest and best use.

THE COURT: *Do you have any case to suggest that [PennDOT] must undertake that investigation and determine its impact on the property and its use by the property owner*?

[BFP's counsel]: I don't believe --

THE COURT: *The magnitude of [PennDOT's] taking, as you put it*.

[BFP's counsel]: *Well I think -- I don't have, Your Honor. I don't think that exists*. But I think when --

THE COURT: But isn't that what you're asking me to do?

[BFP's counsel]: No, I'm not. I'm asking you to take testimony, allow testimony to be offered to demonstrate that it's almost impossible to justify this taking when there was previous testimony that [PennDOT] was put on notice that there was alternative land available immediately adjacent to [the BFP Property] that would have far less impact commercially if it was taken.

And I think in order to measure the difference between that you need to hear the testimony of our expert witness, [] Foreback. Because when you hear this testimony, I think it's going to be fairly compelling that in light of [PennDOT's] knowledge before the December taking, it knew that there was an alternative site available that it could easily have put these [r]etention ponds in, rather than fronting on commercial [State Route] 443. *That it makes more sense to have relocated them than to just [have] forged ahead and taken [the BFP Property]*.

THE COURT: *But does [PennDOT] have an obligation to ensure that what they do minimally impacts the property*

*owner as opposed to doing what's best under the circumstances for the project they're looking to create*?

[BFP's counsel]: I think *in order for Your Honor to determine whether* [*PennDOT*] *did the right thing here, whether* [*PennDOT*] *made an intelligent and informed judgment, you need to know what the impact is to* [] *Bennett and his property holdings*.

Because merely forging ahead with [its] pre-ordained plan may or may not make sense unless you know of the economic impact this is having.

THE COURT: *But, again, my question is, does* [*PennDOT*] *have to look at what impact it has on the property owner when* [*it*] *take*[*s*] *that property*?

[BFP's counsel]: *I think* [*it*] *ha*[*s*] *to do that in order to demonstrate that* [*it has*] *made an intelligent and informed judgment. Because if there was -- if* [*it*] *knew in advance of the taking in December of 2018, that there was a -- a better alternative, a less expensive alternative, an alternative that would be less impactful* **--**

. . . .

[*it*] *could have taken the property that was identified by the -- our expert, the engineer.* [It] could have taken that property instead, installed those [r]etention ponds, and let [] Bennett keep [the BFP Property], which he would have developed into a very valuable piece of property. And now he's being precluded from doing so.

And since that testimony is of record, I think to button up the testimony and demonstrate what we believe to be some poor decision making by PennDOT, and which we believe should be the basis for this [c]ourt's invalidating the taking, I think the [c]ourt needs to consider what the economic impact is based upon the opinion testimony that I anticipate I'll be able to elicit from [] Foreback.

. . . .

THE COURT: *Is that part and parcel of what* [*PennDOT*] *has to look at though when* [*it*] *look*[*s*] *at whether or not what* [*PennDOT has*] *done here was in furtherance of an*

19

*intelligent and informed judgment or that [PennDOT] conducted a suitable investigation*?

[PennDOT's counsel]: No. Your Honor, we will argue, and I'll present testimony, that a suitable investigation was exploring other potential sites along State Route 443 for the location of these [basins]. And that *based upon that undertaking by [PennDOT] and its engineers and consultants that [the BFP Property] was selected as the best one suitable for the [P]roject. And that [] Bennett is going to be compensated through the [Code] for the just compensation of the loss of the value of [the BFP P]roperty*.

I've had the privilege to see the report. We're talking about the development of property. This is vacant land right now. We agree that it's for future development. But it's still just vacant land as of the day of the taking. There's a value that can be placed upon it. It's a total taking.

If this condemnation is to be upheld [] Bennett, either through agreement or through litigation, will be paid the fair market value of [the BFP P]roperty on the date that [PennDOT] acquired it.

R.R. at 204a-209a (emphasis added). Thereafter, the trial court precluded Foreback's testimony.

"The fundamental consideration in determining the admissibility of evidence is whether the evidence is relevant to the fact to be proved." *Am. Auto Wash, Inc. v. Dep't of Env't Prot.*, 729 A.2d 175, 178 (Pa. Cmwlth. 1999). "[R]elevant evidence is any evidence that tends to make a fact in issue more or less probable, and the relevance of a given piece of evidence is a prerequisite to its admissibility." *Commonwealth v. Mitchell*, 902 A.2d 430, 465 (Pa. 2006). Accordingly, the testimony BFP sought to introduce was only relevant and admissible if it "tend[ed] to make **a fact in issue** more or less probable." *Id*. (emphasis added).

20

Evidence of a property's highest and best use is not generally relevant in a condemnation proceeding's preliminary objection stage, except where a de facto taking[7] has been alleged. This Court has noted:

> At the preliminary objection stage of a de facto taking case, evidence of highest and best use is relevant to the issue of whether a de facto taking occurred, that is, whether the condemnee's property was so affected that the condemnee was deprived of the beneficial use and enjoyment of the property's highest and best use.

*Brown v. Pa. Tpk. Comm'n* (Pa. Cmwlth. No. 235 C.D. 2018, filed Jan. 7, 2019), slip op. at 21 (italics omitted).[8] Thus, in *Appeal of Department of Transportation*, this Court explained:

> The trial court's **finding** that **the highest and best use of the property** condemned [by a de facto taking] . . . was for high density residential development [and] **was made <u>only</u> in the context of whether the condemnee's property was so affected that the owners were deprived of the beneficial use and enjoyment of the property for its highest and best use**. This issue is entirely different from what is the fair market value of the property condemned.

*Appeal of Dep't of Transp.*, 605 A.2d at 1291 (bold and underline emphasis added). The instant matter does not involve a de facto taking. Here, PennDOT's Declaration announced an intention to take the entire BFP Property, thereby fully extinguishing BFP's property rights. Accordingly, there was no question in the instant matter that PennDOT's condemnation would deprive BFP of the BFP Property's beneficial use.

---

[7] "The de facto taking concept allows parties to recover where governmental action, while falling short of a physical invasion or appropriation, interferes with property rights to the extent that compensation is required under the United States Constitution." *PBS Coals, Inc. v. Dep't of Transp.*, 244 A.3d 386, 398 (Pa. 2021).

[8] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), unreported opinions are not binding precedent, but may be cited for their persuasive value. *Brown* is cited for its persuasive value.

BFP did not provide any statute or case law to the trial court or this Court to support its position that PennDOT must, as part of its "suitable investigation[,]" and its resulting "intelligent, informed judgment[,]" *Middletown Twp.*, 939 A.2d at 338, consider the BFP Property's highest and best use or the impact on the BFP Property and BFP's intended use, and "seek a reasonable alternative to the taking of the [BFP] Property." BFP Br. at 25. This Court found no statute or case law. Those considerations are not part of a condemnor's aforementioned duties and, therefore, were not **at issue** in the proceedings below.[9] Accordingly, the trial court properly precluded Bennett's and Foreback's testimony regarding the BFP Property's highest and best use during the proceeding's preliminary objection stage.

BFP next argues that the trial court incorrectly interpreted PennDOT's duties under the Code and case law, and that uncontroverted evidence supports BFP's assertion that PennDOT failed to satisfy those duties. BFP contends that, pursuant to *Winger*, PennDOT failed to conduct a suitable investigation, and did not make an intelligent, informed judgment. In *Winger*, the Pennsylvania Supreme Court reversed a decree dismissing an action for injunctive relief seeking to restrain a school district from initiating eminent domain proceedings against the 55-acre Winger Farm. The *Winger* Court held that, because evidence overcame the presumption that the school district's board of directors' "decisions ha[d] been reached by the exercise of intelligent judgment and in a legal manner after suitable

---

[9] BFP's position is, in essence, that PennDOT's condemnation decision is unwise because, given the commercial potential for the BFP Property and the impact on BFP, PennDOT should have chosen another location for its retention ponds. But, "[m]ere evidence that a decision is unwise will not warrant a conclusion that a condemnor has abused its discretion in its selection of a site." *Downingtown*, 557 A.2d at 822. BFP appears to conflate the question of whether PennDOT made an intelligent and informed judgment, with consideration of how the proposed condemnation will affect BFP. That is not the standard. Rather, the standard is whether PennDOT performed a "suitable investigation" and made an "intelligent, informed judgment[.]" *Middletown Twp.*, 939 A.2d at 338.

22

investigation," the school district had abused its discretion by failing to conduct a suitable investigation or exercise intelligent judgment. *See id.* at 523. The Supreme Court observed:

> Although the [b]oard here proceeded vigorously in the assumed interests of the people of the borough, the zeal exercised in the execution of its duties was as excessive as its knowledge of the law applicable to the situation was lacking.
>
> One witness testified, for instance, that the vice president of the [b]oard said that the [b]oard could take more land than it needed for the school building and then sell what remained over. Obviously no school [b]oard can, even in this indirect fashion, go into the real estate business.
>
> The record shows quite clearly that the [b]oard moved precipitately and without adequate preparation for the exercise of so solemn a power as that of eminent domain. No definite plans had been formulated as to the use to be made of the 55 acres. Although the [b]oard knew that so vast an acreage could swallow up one building and many more, no specifications as to the proposed building had yet been indicated; no architect had been retained, and no surveys of the property had been made. Nor had any definitive location on the tract been designated for the intended structure. A bond issue of $150,000[.00] had been approved at the election of November, 1950, for the purpose of purchasing land and constructing a school building, but no estimate of construction costs was yet available.
>
> The darkness in which the directors moved in this most serious business of condemnation of private property was further evidenced by the fact that, although it was generally admitted 55 acres was excessive acreage for the public use intended, the directors were prepared to condemn 71 acres for that purpose had they known the plaintiffs owned an additional tract of 16 acres, title to which was not recorded at the time.

*Winger*, 89 A.2d at 522. *Winger* is distinguishable from the instant case.

23

Here, based on record evidence, the trial court concluded:

> The fact that PennDOT's witnesses testified to the [P]roject's evolution since 2013, explained the extent to which surveys, studies and analysis were conducted and that PennDOT considered, but rejected [BFP's] alternative [proposal], affirms to this [c]ourt that the decision, as laid out, and specifically that part dealing with the ultimate taking of [the BFP Property], was well thought out and planned and clearly an intelligent, informed judgment exercised by PennDOT[,] and not an abuse of discretion as alleged by [BFP].

Trial Ct. Op. at 10.

The crux of Bennett's argument appears to be that PennDOT did not give adequate consideration to **his alternate proposal** and, therefore, PennDOT did not conduct a suitable investigation leading to an intelligent and informed decision. PennDOT's witnesses testified that they **did** consider Bennett's alternative proposal and even visited the BFP Property with Bennett and his engineers. Regardless, as explained, *supra*, BFP's position is not the legal standard. There is no requirement that a condemnor conduct a suitable investigation **specific to an alternative condemnee-requested proposal**. Rather, the requirement that a condemnor conduct a suitable investigation applies to the project itself. While that may include consideration of an alternate proposal, nothing mandates the level of consideration that must be given thereto. A **condemnor's plan** must be for a "proper purpose[,]" and "evidence of a well-developed plan of proper scope is significant proof that an authorized purpose truly motivates a taking." *Middletown Twp.*, 939 A.2d at 338. But a condemnor "is not required to follow any set criteria in choosing a . . . site. All that is required is that an investigation be conducted so that the decision to condemn is an informed judgment." *Downingtown Area Sch. Dist.*, 557 A.2d at 822. In reaching its decision, the trial court properly applied the law and concluded that

24

PennDOT had conducted a suitable investigation and reached an intelligent, informed judgment. Accordingly, this Court discerns no error.

For all of the above reasons, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation by the                      :
Commonwealth of Pennsylvania,                   :
Department of Transportation, of                :
Right-of-Way of State Route 0443,               :
Section 02S, in the Township of                 :
Mahoning                                        :
                                                :
Commonwealth of Pennsylvania,                   :
Department of Transportation                    :
                                                :
                    v.                          :
                                                :
Bennett Family Properties, LLC,                 :    No. 218 C.D. 2020
                    Appellant                   :

## O R D E R

AND NOW, this 10th day of May, 2021, the Carbon County Common Pleas Court's January 21, 2020 order is affirmed.


_____
ANNE E. COVEY, Judge